SCHOLLE v. SECRETARY OF STATE.

ON REMAND.

1. CONSTITUTIONAL LAW—STATE SENATORS—EQUAL PROTECTION.
   Provisions of State Constitution presently setting forth districts for election of State senators *held*, invalid prospectively as a denial of equal protection of law under the Constitution of the United States for lack of a rational basis for the invidiously discriminating apportionment made (US Const, Am 14; Mich Const 1908, art 5, §§ 2, 4, as amended in 1952).

2. SAME—SENATORIAL DISTRICTS—DISPARITY OF POPULATION.
   Provisions of the Constitution of Michigan relative to arrangement of senatorial districts, as such provisions stood before

---

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 18 Am Jur, Elections § 16 *et seq.*
[3, 4, 6] 43 Am Jur, Public Officers § 470 *et seq.*
   49 Am Jur, State Territories and Dependencies § 34.
   18 Am Jur, Elections § 16 *et seq.*
[5] 49 Am Jur, State, Territories and Dependencies §§ 34, 54.
[7, 8] 18 Am Jur, Elections §§ 99–101.
[9] 14 Am Jur, Costs § 91.
   18 Am Jur, Elections § 321.

adoption of amendments hereby declared invalid, prohibit an arrangement of such districts which would result in some districts having more than twice the population of others, per BLACK, KAVANAGH, SOURIS, and OTIS M. SMITH, JJ., such disparity of population being also offensive to the equal protection clauses of the State and Federal Constitutions, per BLACK and KAVANAGH, JJ. (US Const, Am 14; Mich Const 1908, art 2, § 1; art 5, §§ 2, 4, as amended in 1952).

3. SAME—APPORTIONMENT OF SENATORIAL DISTRICTS.

Legislation relative to apportionment of senatorial districts in accordance with the State Constitution as it stood before adoption of amendments hereby declared invalid, as construed to prohibit any district from having more than twice the population of any other district, may properly be enacted by a legislature which includes a *de facto* senate whose existence is continued for all valid purposes for balance of current term, but not thereafter (Const 1908, art 5, §§ 2, 4, as amended in 1952).*

4. OFFICERS—DE FACTO SENATORS.

Senators in the presently constituted State senate, although elected under provisions of the State Constitution that are invalid by reason of being a denial of equal protection of laws under the Constitution of the United States, are continued for the balance of their current term, but not thereafter, as *de facto* officers for all valid purposes (US Const, Am 14; Mich Const 1908, art 5, §§ 2, 4, as amended in 1952).*

5. ELECTIONS—STATE SENATORS.

The secretary of State, as chief election officer of the State, may not presently permit the election of State senators in the absence of valid legislation or constitutional provision authorizing him to do so.*

6. OFFICERS—DE FACTO SENATE.

The acts of the senate, created under an untouched provision of the Constitution, while continuing to function after constitutional provisions apportioning the senatorial districts are declared void as a denial of equal protection of law under the Fourteenth Amendment of the Constitution of the United States, are upheld as the acts of a *de facto* body (US Const, Am 14; Mich Const 1908, art 5, § 1; §§ 2, 4, as amended in 1952).*

---

* See final paragraph of page 179 as to stay granted by a justice of the supreme court of the United States.—REPORTER.

7. ELECTIONS—STATE SENATORS—STATUTES—COURT ORDER.

The secretary of State is ordered to apply to the Supreme Court, in the event valid legislation is not adopted for holding of primaries and election of State senators within 33-day period allowed therefor, for instructions and orders enabling him to call and conduct a special State-wide primary election of candidates 62 days hence, and conduct a State-wide election of number of senators allowed by Constitution prior to adoption of invalid amendment (Const 1908, art 5, §§ 2, 4, as amended in 1952).*

8. SAME—STATE SENATORS—JURISDICTION OF SUPREME COURT.

The Supreme Court retains jurisdiction of proceeding wherein election of State senators in conformity to provisions of State Constitution as they stood prior to adoption of invalid amendments thereto is accomplished and complete disposition of the matter is adequately provided (US Const, Am 14; Mich Const 1908, art 5, §§ 2, 4, as amended in 1952).

9. COSTS—PUBLIC QUESTION—ELECTION OF STATE SENATORS.

No costs are allowed in proceeding involving the election of State senators, a public question being involved (US Const, Am 14; Mich Const 1908, art 5, §§ 2, 4, as amended in 1952).

CARR, C. J., and DETHMERS and KELLY, JJ., dissenting.

Original petition for mandamus by August Scholle, in his own behalf as a citizen and elector in the twelfth Michigan senatorial district, and in a representative capacity as president of the Michigan State Council, AFL-CIO, against James M. Hare, Secretary of State, to command latter in the first instance, not to issue 1960 election notices or perform acts requisite to election of State senators under the present senatorial districting, praying that amendments to article 5, §§ 2 and 4, of the Constitution be declared invalid as violative of provisions of the Constitution of the United States, praying that said sections in respect to senate apportionment or districting be declared unamended, that the Court declare that no apportionment or

---

* See final paragraph of page 179 as to stay granted by a justice of the supreme court of the United States.—REPORTER.

districting act is extant, and further praying that the writ command defendant to declare and conduct senatorial elections on an at-large basis until an apportionment or districting act can be passed, and further praying that the Court retain jurisdiction pending reapportionment.

Frank D. Beadle, senator from the thirty-fourth district, and Albert K. Blashfield, a constituent of the thirty-third senatorial district, on their motion, joined as parties defendant. John W. Cummiskey, a constituent of the sixteenth senatorial district, John W. Fitzgerald, senator from the fifteenth district, and Paul C. Younger, senator from the fourteenth district, on their motion to be joined as parties defendant, permitted to intervene.

Prior judgment of Supreme Court of Michigan (360 Mich 1) dismissing petition vacated upon appeal to supreme court of the United States.

Submitted on remand July 2, 1962. (Docket No. 63, Calendar No. 48,580.) Writ of mandamus granted July 18, 1962. Amendments to Constitution 1908, art 5, §§ 2 and 4, declared violative of Fourteenth Amendment to Constitution of the United States and therefore invalid. Reference made to governor and legislature for reapportionment under previously existing constitutional provisions, the presently constituted senate being adjudged to be a continuing *de facto* body. Jurisdiction retained pending transition. Directions given as to conduct of elections for State senators.

On July 27, 1962, an order was issued by a justice of the supreme court of the United States to stay the senatorial redistricting order of the Supreme Court of Michigan pending the timely filing of a petition for writ of certiorari and a further stay pending the final disposal of the petition. Application for certiorari filed in the supreme court of the United States October 15, 1962.

*Rothe, Marston, Mazey, Sachs & O'Connell (Theodore Sachs,* of counsel), for plaintiff.

*Frank J. Kelley,* Attorney General, and *Eugene Krasicky,* Solicitor General, for defendant, concluding certain provisions violative of Federal Constitution and suggesting remedial measures.

*Edmund E. Shepherd,* for intervening defendants and intervenors.

*Amicus Curiae: Creighton R. Coleman, in propria persona.*

### On Remand

KAVANAGH, J. As we approach determination of the merits, following vacation by the supreme court (*Scholle* v. *Secretary of State,* 369 US 429 [82 S Ct 910, 8 L ed 2d 1]), of the judgment entered here June 6, 1960 (360 Mich 1), each unmanageable member of the Court faces an arrogant and amply headlined threat of impeachment "if the senate districts are declared illegal."[1] This threat should neither hasten nor slow the judicial process.[2] It does call into play Marshall's grim words (quoted in *O'Donoghue* v. *United States,* 289 US 516, 532 [53 S Ct 740, 77 L ed 1356]):

"The judicial department comes home in its effects to every man's fireside; it passes on his property, his reputation, his life, his all. Is it not, to the last degree important, that he (the judge)

[1] Detroit Free Press, metropolitan edition, Friday, June 29, 1962, front page article, under headline "Threaten to Impeach Top Court."

[2] Today's effort to intimidate the Court finds its historic counterpart when, in Marshall's time, a "seethingly hostile" congress "closed down the supreme court for a year." That challenge of judicial independence, and the way it was handled ultimately by the Marshall court, is chronicled in Rodell's "Nine Men," pp 85-90 (Random House, New York 1955).

should be rendered perfectly and completely independent, with nothing to influence or control him but God and his conscience?  *  *  *  I have always thought, from my earliest youth till now, that the greatest scourge an angry Heaven ever inflicted upon an ungrateful and a sinning people, was an ignorant, a corrupt, or a dependent judiciary."

Only an ignorant, a corrupt, or a dependent judge would cringe and pause before any such formidable threat.  We choose instead to consider and execute the duty which has been cast here by the supremacy clause and the oath *all* judicial officers of Michigan have taken.

If the laws of Michigan, brought now to question again, do offend the right of thousands upon thousands of Michigan citizens to federally guaranteed equal protection, and the writer did so find more than 2 years ago, then this Court, loyal to its oath, should say so now; now that jurisdiction to say so has been specifically confirmed by the United States supreme court.  Failing in such regard, another biennially extended election of members of the upper house will have come and gone under patently unconstitutional law; law so invidiously discriminatory that but feeble effort is and can be made to sustain it as against the current surge of national authority which, almost daily, arrives from a steadily increasing number of the States.  Indeed, the position of these intervening defendants seems only to be that a little equality goes a long way and that too much equality goes too far.

The Supreme Court of Michigan did not ask for submission of this issue and its now unavoidable determination.  Some of the veterans of the legislature, along with their predecessors, failed regularly to execute the constitutional oath each had taken to redistrict and reapportion under original section 4 of the fifth article of the Michigan Con-

stitution (1908). They and they alone are responsible for justiciable presentation and consideration of the issue before this Court. Had they faithfully and decennially executed said section 4 the powers of this Court, and those of the United States supreme court, never could have been invoked; nor would those powers now be called to action. So much for any suggestion that the courts of this country are invading without warrant the processes and powers of a separate branch of government. What the courts do is no invasion; it is no more and no less than performance of their duty to guard vigilantly government by constitutional law.

Is it not true that this Court of last resort of a State, when it is called upon to determine the merits of a duly presented and manifestly decisive Federal question, sits for the required time as an inferior court of the United States? And is it not true that, for solution of the presented question, we are obliged to hold that the Constitution of the United States is controlling where, as found here, one of its provisions stands in conflict with provisions of a State Constitution? For answer see *Testa* v. *Katt,* 330 US 386, 390, 391 (67 S Ct 810, 91 L ed 967, 172 ALR 225), wherein *Claflin* v. *Houseman,* 93 US 130 (23 L ed 833),[3] was unanimously characterized as follows:

"The opinion of a unanimous court in that case was strongly buttressed by historic references and

[3] This passage, taken from the *Claflin Case,* exposes the rule fully (p 137):

"The fact that a State court derives its existence and functions from the State laws is no reason why it should not afford relief; because it is subject also to the laws of the United States, and is just as much bound to recognize these as operative within the State as it is to recognize the State laws. The 2 together form 1 system of jurisprudence, which constitutes the law of the land for the State; and the courts of the 2 jurisdictions are not foreign to each other, nor to be treated by each other as such, but as courts of the same country, having jurisdiction partly different and partly concurrent."

persuasive reasoning. It repudiated the assumption that Federal laws can be considered by the States as though they were laws emanating from a foreign sovereign. Its teaching is that the Constitution and the laws passed pursuant to it are the supreme laws of the land, binding alike upon States, courts, and the people, 'any thing in the Constitution or laws of any State to the contrary notwithstanding.' It asserted that the obligation of States to enforce these Federal laws is not lessened by reason of the form in which they are cast or the remedy which they provide."

Lest someone might suggest that we are not speaking in this context of State constitutional provisions and State statutes alike, we would refer them to the rule of *Standard Computing Scale Co.* v. *Farrell,* 249 US 571, 577 (39 S Ct 380, 63 L ed 780):

"For the protection of the Federal Constitution applies, whatever the form in which the legislative power of the State is exerted; that is, whether it be by a constitution, an act of the legislature, or an act of any subordinate instrumentality of the State exercising delegated legislative authority, like an ordinance of a municipality or an order of a commission. *Great Northern R. Co.* v. *Minnesota,* 238 US 340 (35 S Ct 753, 59 L ed 1337); *Home Telephone & Telegraph Co.* v. *Los Angeles,* 227 US 278, 286–288 (33 S Ct 312, 57 L ed 510); *State of Washington, ex rel. Oregon Railroad & Navigation Co.,* v. *Fairchild,* 224 US 510 (32 S Ct 535, 56 L ed 863); *Grand Trunk Western R. Co.* v. *Railroad Commission of Indiana,* 221 US 400, 403 (31 S Ct 537, 55 L ed 786)."

The decision of the supreme court, reversing our majority decision and remanding the case for further consideration in the light of *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663), was handed down April 23, 1962. Accordingly, and at the be-

ginning of the present term, the following order
for resubmission was entered (June 5, 1962):

"In this cause a motion is filed by plaintiff for
summary judgment or in the alternative to advance
the cause for prompt hearing, and answers thereto
having been filed by defendant and by intervening
defendants, and due consideration thereof having
been had by the Court, it is now ordered that the
case be and the same hereby is ordered submitted
for rehearing on July 2, 1962 at 10 o'clock in the
forenoon of that date, such rehearing to be on
present appendices and briefs as filed with our
clerk augmented by the United States supreme
court's opinion of April 23, 1962 in this cause,[4] and
by such additional briefs as counsel may be advised
to file on or before the oral arguments scheduled
above."

In pursuance of such order the case was fully re-
submitted. No further proof or pleading was of-
fered. Neither was request made for submission
of further proofs. Thus the case is before us on
a record made more than 2 years ago; a record each
then member[5] of the Court must have studied with
painstaking care prior to consideration and review
of the exhaustive opinions which appear between
pages 1 through 125 of the 360th Michigan Report.
It is false, then, to say that meager time has been
allotted for proper consideration of the merits of
this all important case. Doubtless no case sub-
mitted to this Court in modern times is known so
well to the members who would protest that our
determination of the merits should be delayed the
more that they may study it the more; pointedly
until that determination comes too late for legisla-
tive reapportionment of the senate and senatorial

---

[4] *Scholle* v. *Secretary of State,* 369 US 429 (82 S Ct 910, 8 L ed
2d 1).—REPORTER.
[5] Justice OTIS M. SMITH is the only presently participating Justice
not then a member of the Court.

elections this year; likewise too late for direly pertinent advices the presently assembled constitutional convention should receive and heed before it, as imminently provided, passes for all time into the pages of history. By Magna Carta's fortieth grant, "To none will we sell, to none' will we deny, or delay, right or justice."

Now that 2 years have intervened since the decision of this Court in the case of *Scholle* v. *Secretary of State,* 360 Mich 1, we ask ourselves: Are there any intervening facts, judicially noticeable or otherwise, that would change the former finding that the present senatorial districts of Michigan lack a rational, reasonable, uniform, or even ascertainable nondiscriminatory legislative purpose?

None has been suggested, and we find none. A comparison of the population growth using the 1950 and 1960 Federal censuses indicates that the disparities are growing with the population increase at an average of approximately 150,000 persons per year.

The absence of any semblance of design or plan in the present senatorial districts was recently acknowledged by D. Hale Brake, a Michigan lawyer and former State treasurer from 1943 through 1954, now a constitutional convention delegate, in an article entitled, "The Old and the New Constitutions—a Comparison and Appraisal" dated May 16, 1962, signed by Mr. Brake, Director, Education Division, Michigan Association of Supervisors, 319 W. Lenawee, Lansing 33, Michigan, and sent to the members of the association. Mr. Brake concluded with appropriate accuracy:

"Our present senate, of course, does not follow any plan. It is simply an arbitrary freezing in of various districts."

Having duly considered the additional briefs submitted, the oral arguments made by the parties and for the reasons set forth in detail in my opinion recorded in *Scholle* v. *Secretary of State,* 360 Mich 1, we hold plaintiff has been and is being deprived of the equal protection of the laws within the meaning of the Fourteenth Amendment to the United States Constitution, by the provisions of article 5 of the Michigan Constitution of 1908, as amended in 1952, by which plaintiff's vote for the office of State senator is invidiously unequal to the votes cast for State senator by other citizens of the State, the classification of citizens in the senatorial districts being arbitrary, discriminatory, and without reasonable or just relation or relevance to the electoral process. Sections 2 and 4 of article 5 of the Michigan Constitution of 1908, as amended in 1952, are therefore declared a violation of the Fourteenth Amendment of the United States Constitution and are void.

We turn then to a consideration of the provisions of article 5, sections 2 and 4 of the 1908 Constitution without the 1952 amendment,[6] to test the present senate apportionment in the light of adjudicated cases of the Michigan Supreme Court and the application thereto of the Fourteenth Amendment. We

---

6 Sections 2 and 4 of article 5 of the Michigan Constitution (1908) without the 1952 amendment read as follows:

"Sec. 2. The senate shall consist of 32 members. Senators shall be elected for 2 years and by single districts. Such districts shall be numbered from 1 to 32, inclusive, each of which shall choose 1 senator. No county shall be divided in the formation of senatorial districts, unless such county shall be equitably entitled to 2 or more senators."

"Sec. 4. At the session in 1913, and each tenth year thereafter, the legislature shall by law rearrange the senatorial districts and apportion anew the representatives among the counties and districts according to the number of inhabitants, using as the basis for such apportionment the last preceding United States census of this State. Each apportionment so made, and the division of any county into representative districts by its board of supervisors, made thereunder, shall not be altered until the tenth year thereafter."

find our Court in *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402), considering a similar action by citizens to declare statutory rearranging of the senate districts unconstitutional and void, where Justice GRANT, speaking for the Court, said (p 7):

"It was never contemplated that 1 elector should possess 2 or 3 times more influence, in the person of a representative or senator, than another elector in another district. Each, insofar as it is practicable, is, under the Constitution, possessed of equal power and influence. Equality in such matters lies at the basis of our free government. It is guaranteed, not only by the Constitution, but by the ordinance of 1787, organizing the territory out of which the State of Michigan was carved."

Justice GRANT went on to say (p 8):

"It (the Constitution) requires the exercise on the part of the legislature of an honest and fair discretion in apportioning the districts so as to preserve, as nearly as may be, the equality of representation."

Justice McGRATH in a concurring opinion in *Giddings* said (p 13):

"The purpose of the constitutional enactment is to secure as nearly as possible equality of representation. Any apportionment which defeats that purpose is vicious, contrary not only to the letter of the Constitution, but to the spirit of our institutions, and subversive of popular government. Power secured or perpetuated by unconstitutional methods is power usurped, and usurpation of power is a menace to free institutions."

The Court stated its conclusions as follows (p 9):

"1. The petition is properly brought into this Court by the relator.

"2. The Court has jurisdiction in the matter.

"3. The apportionment acts of 1891 [No 175] and 1885 [No 183] are unconstitutional and void.

"4. The writ of mandamus must issue, restraining the respondent from issuing the notice of election under the act of 1891, and directing him to issue the notice under the apportionment act of 1881, unless the executive of the State shall call a special session of the legislature to make a new apportionment before the time expires for giving such notice."

Fourteen years later, in the June term of 1906, this Court again had before it similar reapportionment acts according to which certain senatorial districts had more than double the population of others. The Court again ruled in accordance with *Giddings,* that such a disparity between districts made the acts unconstitutional. See *Williams* v. *Secretary of State,* 145 Mich 447.

It is to be noted that Justices Douglas, Black, and Murphy, dissenting in *MacDougall* v. *Green,* 335 US 281, 288 (69 S Ct 1, 93 L ed 3), stated:

"None would deny that a State law giving some citizens twice the vote of other citizens in either the primary or general election would lack that equality which the Fourteenth Amendment guarantees."

We would conclude, then, under the rule of *Williams* and *Giddings* as applied by our own Court, that any law of our State giving some citizens more than twice the votes of other citizens[7] in either the primary or general election would lack constitutional equality so as to void that law. Here, then, written in *Williams* and 48 years later by dissenting justices in the *MacDougall Case,* is a maximal standard by which the legislature and the constitutional convention may receive fair guidance. When a legislative apportionment provides districts having more than double the population of others, the

[7] Ratio of representation under present senatorial apportionment: 1950 census approximately 7 to 1; 1960 census approximately 12 to 1.

constitutional range of discretion is violated. This
is not to say that less than such 2 to 1 ratio is con-
stitutionally good. It is to say only that peril ends
and disaster occurs when that line is crossed.

We regard Michigan as fortunate for, unlike other
States, we have in the *Williams* and *Giddings Cases*
judicial interpretation in applying the identical con-
stitutional phrases to which the legislative destiny
of Michigan is now returned. We hope the legisla-
ture will act promptly to fill the void, and that its
prompt action will eliminate need for a State-wide
at-large primary and general election of State sena-
tors.

The *Williams Case,* the doctrine of which we now
affirm, marks the outermost boundary of that con-
stitutional discretion which, in 1908, the people
awarded to the legislature in the name of local as
well as national equal protection. Equal protection,
in the context of this case, does not mean arithmeti-
cal equality. Section 2's restriction against division
of a county and the stated exception to such restric-
tion, alone would prevent such arithmetical equality.
It does mean that equality which fairly approxi-
mates, by the standards of reasonable minds exercis-
ing fair discretion, that which should have been done
decennially between 1908 and 1952 and must now be
done to ensure that reasonably uniform right of gov-
ernmental representation which came to life by im-
pact of the Declaration of Independence. It means,
too, that when any apportionment plan provides
some elective districts having more than double the
population of others, that plan cannot be sustained.
And so we hold in final summation that the Four-
teenth Amendment and our own corresponding

pledge of the protection of equal laws (art 2, § 1)[8] do require that the senatorial districts of Michigan be so arranged as to be consistent with the foregoing maximum 2-to-1 ratio.

That is enough for decision of the present case. We may add, however, that other programs creating elective districts, whether on an area versus population basis, or gerrymandered as to shape or want of contiguity, or planned for purposes of invidious discrimination or iniquitous advantage, may some day be presented to this Court for test against the national and State equality clauses, but we do not pass on them at the present time. There could be no question, however, that they would have to meet the foregoing test set forth in the *Williams* and *Giddings Cases* and in *MacDougall* v. *Green, supra.* Perhaps they would be required to do more, but certainly not less.

Due consideration having been given to the foregoing conclusions and findings, and the Court being fully advised, it is now and here adjudged and ordered as follows:

(1) That present sections 2 and 4 of article 5 of the Constitution of Michigan (1908), referring specifically to those sections as ratified at the general election held November 4, 1952, do as charged by plaintiff offend and therefore do fall before the equality clause of the Fourteenth Amendment of the Constitution of the United States. Said sections 2 and 4 are consequently adjudged invalid, prospectively from and after the date hereof.

(2) That no legislation exists in Michigan, effected either by statute or constitutional provision, un-

---

8 "The equality of rights protected by our Constitution is the same as that preserved by the Fourteenth Amendment to the Federal Constitution. *In re Fox's Estate,* 154 Mich 5." (Quotation from *Naudzius* v. *Lahr,* 253 Mich 216, 222 [74 ALR 1189, 30 NCCA 179]; followed in *Cook Coffee Co.* v. *Village of Flushing,* 267 Mich 131.)

der or by which candidates for the office of State senator may validly be elected for the biennial term commencing January 1, 1963.

(3) That the primary election of candidates for the office of State senator, scheduled now in the hitherto constituted 34 senatorial districts of Michigan, for conduct on August 7, 1962, be and the same is restrained and enjoined by force of this Court's writ of mandamus, which writ shall issue forthwith to the defendant secretary of State. The defendant secretary, as chief election officer of the State and supervisor of all local election officers in the performance of their duties,[9] will by timely regulation and instruction do and perform such acts as will ensure State-wide observance of the restraint directed by said writ.

(4) For the purpose of ensuring validity of all legislation which, being otherwise valid, may have been enacted into statute by the legislature prior to the date of this judgment; and for the further purpose of ensuring validity of legislation and joint resolutions (for submission of any proposed constitutional amendment) as may hereafter be enacted into statute or adopted by the legislature during the remainder of the year 1962; and for the further purpose of providing means for the enactment of valid new legislation during the present legislative session, comporting with original sections 2 and 4 of said article 5, and for the further purpose of providing means by which this judgment may receive prompt performance and due execution, it is adjudged that the presently constituted senate shall, from this date and until December 31, 1962, but not thereafter, function as a *de facto* body and that the

[9] Pertinent sections of the Michigan election law as amended (CLS 1956, § 168.21, and CLS 1956, § 168.31, as amended by PA 1957, No 249 [Stat Ann 1956 Rev § 6.1021 and Stat Ann 1961 Cum Supp § 6.1031]).

members of the senate elected as such for the current term shall, from this date and until December 31, 1962, but not thereafter, function as *de facto* officers for all valid purposes. Reference is pertinently made to the general rule that where the law creating a public office is declared void the acts of an officer continuing to function thereunder will, until he is legally succeeded, be upheld as the acts of a *de facto* officer. See *People* v. *Buckley,* 302 Mich 12; *People* v. *Russell,* 347 Mich 193; *Greyhound Corp.* v. *Public Service Commission,* 360 Mich 578.[10]

(5) That the governor and legislature be advised, respectfully by the judicial department, that legislation is urgently required under and in pursuance of original sections 2 and 4 of said article 5, by which 32 senatorial districts of Michigan are arranged according to the number of inhabitants of the State as shown by the most recent United States census of Michigan, and under and in pursuance of which candidates for the office of senator in each of such newly arranged districts may be nominated and elected for the coming biennial term.

(6) In event valid legislation, recommended aforesaid, is not enacted with necessary immediate effect on or before August 20, 1962, the defendant secretary will apply forthwith to this Court for such instructions and orders as will enable him to call and conduct a special State-wide primary election of candidates for the office of State senator on September 11, 1962, and as will enable him to call and conduct a State-wide election on November 6, 1962, of the necessary number of State senators, 32 in all, for such coming biennial term.

(7) That jurisdiction of this cause be and is retained indefinitely, pending further order or orders, until the transition from invalid sections 2 and 4

---

10 That part of the opinion of the *Greyhound Case* which dealt with the status of *de facto* officers was unanimous.

of said article 5, to original sections 2 and 4 of said article 5, is fully accomplished and complete disposition of the involved subject matter is adequately provided.

If necessary, additional appropriate writs will issue by the presently seated Court for due enforcement of the foregoing judgment.

No costs, a public question being involved.

BLACK, J., concurred with KAVANAGH, J.

CARR, C. J. (*dissenting*). This case involves an attack by plaintiff on the validity of article 5, § 2, of the State Constitution (1908), as amended by vote of the people at the November election in 1952. Said section relates specifically to the State senate and the election of the members thereof by single districts. The amendment was proposed and submitted to popular vote on the basis of petitions filed by qualified and registered electors of the State as provided in article 17, § 2, of the State Constitution as amended at the general election of April 7, 1941. At the 1952 election there was also submitted a proposed amendment requiring that the members of both houses of the legislature be selected on the basis of a legislative apportionment in accordance with population. The latter amendment was defeated while the adoption of the amendment here in question was carried by a substantial vote.

The amendment now attacked was submitted on the ballot as "Proposal No 3", its purpose being declared to be "to establish senatorial districts and provide for decennial reapportionment of representatives." (PA 1953, p 438.) Considering the amendment in its entirety as relating to the election of the members of the bicameral legislature, it was obviously the intention of the people that members of the house of representatives should be selected from dis-

tricts which shall contain "as nearly as may be an equal number of inhabitants." Insofar as the senate was concerned the people undertook by the amendment to divide the State into 34 districts, from each of which a member of the senate should be elected. Said districts were specifically set forth in article 5, § 2. Senatorial districts as previously existing were materially changed, and the number increased from 32 to 34. That the factor of population was not overlooked is indicated by the provision of said section that senatorial districts within a county shall contain, as nearly as may be, an equal number of inhabitants. Unquestionably the basic plan of the people as set forth in the amendment was to divide the State into designated districts, the geographic division being adopted as stated. The provision in the Federal Constitution for 2 senators from each State may have served to suggest such method.

It must be assumed, and it clearly appears, that the people in making these provisions for selection of members of the house and senate sought a general plan for the legislative department of the State government that would best serve the State as a whole. While population is the controlling factor as far as representatives are concerned, it was obviously deemed that the rights of the people living in different sections of the State would be best protected by the adoption of a geographical basis, in part, of apportionment as to the senate. It is, of course, apparent that if the members of both houses are selected on a strictly population basis the urban industrial centers, having the largest number of inhabitants, would be enabled to dominate the legislative department of the State government. It was this kind of a situation that the framers of the amendment now in question here, and the people adopting it, had in mind at the time. The question now presented is, was such plan irrational? Must it be said that it consti-

tutes an "invidious" attempt to deprive any section of the State, or any portion of its inhabitants, of their just rights under the fundamental laws of the State and of the Nation?

In attacking article 5, § 2, of the Constitution, as amended, plaintiff insists that it violates the equal protection clause of the Fourteenth Amendment to the Federal Constitution. In his petition for a writ of mandamus to prevent the secretary of State, defendant herein, from issuing election notices for State senators to be chosen at the 1960 general November election the claim is advanced that senatorial districts must be established on the basis of population. Obviously it is the claim that in electing members of a bicameral legislature population must be the sole criterion to be followed, and that any plan involving an attempt to protect the interests of the less densely populated sections of the State is invalid because not affording equal protection to residents in heavily populated urban centers. We are not in accord with such theory.

The case was instituted in this Court by petition for a writ of mandamus against the secretary of State requiring that official to refrain from acting under the Michigan election law with reference to the election of State senators. Said petition does not specifically allege wherein plaintiff or others whom he claims to represent have actually been prejudiced as a result of State senators being chosen in Michigan at the last 4 general November elections in accordance with the amendment of 1952. There is no showing that as a result of such method of senatorial selection improper legislation has been enacted to the prejudice of plaintiff or of others. In view of the record of the Michigan legislature there would seem to be no basis for any possible argument that the State of Michigan has suffered, or that any segment of its population has been prejudiced. The realistic

situation presented is that no section of the State has suffered from legislative discrimination. There is no showing that either house of our legislature has failed to discharge its responsibilities to the public generally, or that the basic principle of equal protection of the laws has been violated because of the plan adopted by the people acting in their sovereign capacity at the 1952 election.

When the controversy first came before this Court in 1960 a majority of the justices concluded that under prior decisions of the United States supreme court, including *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432), and other decisions of like import cited by Mr. Justice EDWARDS in his opinion, the nature of the issue did not bring it within the scope of the jurisdiction of this Court, and that such issue was not a justiciable one. Accordingly, plaintiff's petition was denied (360 Mich 1), and his subsequent application for rehearing was also denied. Thereupon plaintiff sought to appeal to the supreme court of the United States.

Thereafter the case of *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663), was submitted to the Supreme Court for determination. The case was an appeal from the decision of a Federal district court rejecting an attack on legislative apportionment statutes of Tennessee. In that case the State constitution required reapportionment at regular intervals, but the legislature had not taken action since 1901. In other words, there was no compliance by the State legislature with the mandate of constitutional provisions by which it was bound. The supreme court, Justices Frankfurter and Harlan dissenting, concluded that a justiciable question was involved and remanded for further consideration of the controversy on its merits. In taking such action attention was called (p 193) to the fact that the fundamental law of Tennessee did not provide for the ex-

ercise of the power of the initiative or the referendum on the part of the electors of the State. It was suggested that under said circumstances no remedy was available other than by appeal to the court. Obviously such is not the situation in Michigan. Here the power to initiate, by petition, legislation and constitutional amendments (as well as the referendum) is reserved to the people by the express language of our Constitution.

Following the action taken in the Tennessee case the supreme court of the United States remanded the present controversy to this Court, directing by mandate received under date of May 29, 1962, that we give the case further consideration in the light of *Baker* v. *Carr*. We do not understand from the opinions filed by members of the court of last resort of the Nation that any question was determined other than that the controversy is justiciable. In consequence, we are now confronted by the question whether it must be said that the plan adopted in 1952 by the people of this State with reference to the selection of members of its bicameral legislature offends the equal protection clause of the Fourteenth Amendment.

In *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3), the court refused to hold invalid an Illinois statute relating to the nomination of candidates for a new political party, it being contended, as in the case before us, that the Fourteenth Amendment was violated. Commenting on the issue involved and the arguments advanced, it was said (pp 283, 284):

"To assume that political power is a function exclusively of numbers is to disregard the practicalities of government. Thus, the Constitution protects the interests of the smaller against the greater by giving in the senate entirely unequal representation to populations. It would be strange indeed, and doctrinaire, for this court, applying such broad consti-

tutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former. The Constitution—a practical instrument of government—makes no such demands on the States. *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432), and *Colegrove* v. *Barrett,* 330 US 804 (67 S Ct 973, 91 L ed 1262)."

We note that in the opinion of Mr. Justice Stewart, who concurred in the holding of the majority in *Baker* v. *Carr, supra,* reference was made to the above quoted case, it being said that (pp 265, 266):

"In *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3), the court held that the equal protection clause does not 'deny a State the power to assure a proper diffusion of political initiative as between its thinly populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.' 335 US, at 284. In case after case arising under the equal protection clause the court has said what it said again only last term—that 'the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others.' *McGowan* v. *Maryland,* 366 US 420, 425 (81 S Ct 1101, 1153, 1218, 6 L ed 2d 393). In case after case arising under that clause we have also said that 'the burden of establishing the unconstitutionality of a statute rests on him who assails it.' *Metropolitan Casualty Ins. Co.* v. *Brownell,* 294 US 580, 584 (55 S Ct 538, 79 L ed 1070).

"Today's decision does not turn its back on these settled precedents. I repeat, the court today decides only: (1) that the district court possessed jurisdiction of the subject matter; (2) that the complaint

presents a justiciable controversy; (3) that the appellants have standing."

Reference to the *MacDougall Case* was also made in the opinions of other justices. We have before us, therefore, the question hereinbefore stated, that is, whether the plan adopted by the people in the 1952 amendment to the Constitution is irrational and discriminatory to a degree requiring its expunging from the fundamental law of this State on the ground that it violates the equal protection clause of the Fourteenth Amendment to the Federal Constitution. Applying the principle announced in *MacDougall* v. *Green, supra,* we submit that such question must be answered in the negative. Such plan was adopted in the light of circumstances prevailing in the State of Michigan, with reference to varied conditions existing in different parts of the State, and for the proper purpose of protecting the rights of the people in the more sparsely settled sections. It was not intended to perpetrate an undue hardship or an injustice on any part of our population, *nor has it operated to do so.* The burden of proof to establish that a provision of the fundamental law of the State is invalid rests on the plaintiff, and that burden has not been sustained. The 1952 amendment now in question was not challenged immediately following its adoption, nor has any attempt been made to change it by the orderly process of amendment to the Constitution by resort to the same method of procedure that brought about the submission and adoption of said amendment.

If a majority of the members of this Court grant the relief sought in plaintiff's petition and hold invalid the 1952 amendment to article 5, § 2, of our Constitution, an unfortunate situation will result. It must be borne in mind that the attack here is not on the right of the present members of the State senate

to hold their offices but, rather, goes to the right of existence of those offices themselves as established under the amendment. The people by their action in 1952 created additional senatorial districts, and the new districts created were not in many instances identical with those fixed under the prior apportionment statute. If the amendment is adjudged invalid, the senatorial districts created thereby become nonexistent, and for obvious reasons the members of the Senate elected from said districts cannot be deemed *de facto* officers for any purpose. There cannot be a *de facto* officer unless there is a *de jure* office. The law in this respect was rather succinctly stated as follows in the opinion of the supreme court of the United States in *Norton* v. *Shelby County,* 118 US. 425, 441, 442 (6 S Ct 1121, 30 L ed 178) :

"The doctrine which gives validity to acts of officers *de facto,* whatever defects there may be in the legality of their appointment or election, is founded upon considerations of policy and necessity, for the protection of the public and individuals whose interests may be affected thereby. Offices are created for the benefit of the public, and private parties are not permitted to inquire into the title of persons clothed with the evidence of such offices and in apparent possession of their powers and functions. For the good order and peace of society their authority is to be respected and obeyed until in some regular mode prescribed by law their title is investigated and determined. It is manifest that endless confusion would result, if in every proceeding before such officers their title could be called in question. But the idea of an officer implies the existence of an office which he holds. It would be a misapplication of terms to call one an officer who holds no office, and a public office can exist only by force of law. This seems to us so obvious that we should hardly feel called upon to consider any adverse opinion on the subject but for the earnest contention of plaintiff's counsel that

such existence is not essential, and that it is sufficient if the office be provided for by any legislative enactment, however invalid. Their position is, that a legislative act, though unconstitutional, may in terms create an office, and nothing further than its apparent existence is necessary to give validity to the acts of its assumed incumbent. That position, although not stated in this broad form, amounts to nothing else. It is difficult to meet it by any argument beyond this statement. An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; it creates no office; it is, in legal contemplation, as inoperative as though it had never been passed."

In accord with the holding above quoted are: *Carleton* v. *People,* 10 Mich 250; *People* v. *Payment,* 109 Mich 553; *Kidd* v. *McCanless,* 200 Tenn 273 (292 SW 2d 40).[1] If this Court enters judgment in accordance with plaintiff's demand that article 5, § 2, of the State Constitution is and has been from its inception a nullity, then the State of Michigan will necessarily be left without a State senate and, hence, without a legislature that can function under the Constitution. Striking from the fundamental law of Michigan the provision for designated senatorial districts will obviously terminate the existence of such districts. This Court is without power to give to those previously elected therefrom the status of *de facto* incumbents of offices that no longer exist.

It is interesting to note that the district court of the United States for the middle district of Tennessee, to which the supreme court remanded *Baker* v. *Carr* for further consideration, came to the conclusion (206 F Supp 341) that the apportionment acts passed by the legislature of Tennessee were invalid, but declined to enter a judgment in accordance with

[1] Appeal dismissed, 352 US 920 (77 S Ct 223, 1 L ed 2d 157).—REPORTER.

its opinion. The court decided to withhold final action on the issues presented, including any declarations of invalidity or the issue of injunctive process, in order to permit the selection of a State legislature, under the alleged invalid statutes, to act at its 1963 session, the members of such legislature to be elected during the current year. It was pointed out that such method of procedure would obviate the possibility of the State being left without a legislative body, under the holding in *Kidd* v. *McCanless, supra,* as the result of a judgment of invalidity. The court obviously realized the situation that would be presented in the event of a judgment entered without affording a reasonable opportunity for the State legislature to act.

It was apparently recognized also that the 1962 legislature, which had enacted apportionment statutes during the pendency of the litigation and considered therein pursuant to stipulation of the parties, but which the Court deemed invalid, could scarcely be expected to enact a statute that would be sustained. For such reason it was deemed to be a realistic solution of the problem to withhold entry of judgment, allowing a new legislature to be elected and giving it a reasonable opportunity to adopt proper statutes that would not offend against constitutional provisions. Commenting on the procedure to be observed, it was said in part (p 350):

"This will permit the election of a State legislature under the 1962 statutes with full authority and power to discharge validly and legally the legislative functions of the State. It will enable the general assembly to act with the express sanction of the court to effect the necessary remedial measures and consequently in 'good faith' as far as its authority is concerned. Under such conditions the restrictive view of the *de facto* rule announced in *Kidd* v. *McCanless* will not apply. If it should be argued that

this is a somewhat technical method to circumvent the ruling in that case, the answer is threefold: First, *Kidd* v. *McCanless* itself represents a rather technical effort by a court to avoid entering an area which courts then generally regarded as involving political and nonjusticiable issues, a view now undercut by the supreme court's decision in this case. Second. This remedial method has the advantage of avoiding a far more drastic form of relief which could conceivably entail a direct intrusion into State affairs. Third. It is justifiable on the basis of the wide latitude of discretion resting in the court in devising remedies in cases of this type.

"Accordingly, an order will be entered reserving final judgment herein on all issues until the 1963 general assembly constituted and elected under the 1962 statutes has had an opportunity at its regular 1963 session to act on the matter of legislative apportionment, but not later than June 3, 1963. After that date, or after the date of adjournment of the general assembly if occurring prior to June 3, 1963, the case may be reopened upon application of any party or upon the court's own motion. However, notwithstanding such time limits for reopening, full jurisdiction is retained, and the order will provide that if necessary or proper for any reason, the action may be reopened at any time hereafter, either upon the court's own motion or upon the application of any party."

Obviously the course pursued by the Federal district court in Tennessee is adapted to the prevention of a chaotic condition in the State government, and to obviate also the adoption of some method of apportionment by the Court that might be subject to question as to the requisite authority therefor. What was said by the Federal district court in determining the appropriate procedure in *Baker* v. *Carr* is, in large measure, applicable in the controversy before us. In view of the situation existing in Michigan, it clearly appears that a like course is

imperative here, if a majority of this Court finally concludes that article 5, § 2, of our present Constitution is invalid.

In the judgment proposed by Mr. Justice KAVANAGH immediate action is obviously contemplated. If the proposed order is entered as the judgment of a majority of the members of this Court participating in the case the obvious result would be a chaotic condition entailing the exercise of doubtful powers of this Court, interfering with the election laws of the State, and, likewise, interrupting the orderly course of legislative proceedings.

The procedure adopted by the Federal district court in *Baker* v. *Carr* found support in prior decisions cited therein. In *McGraw* v. *Donovan* (DC Minn, July 10, 1958), 163 F Supp 184, the Federal district court of Minnesota, third division, was asked to hold invalid a statute enacted by the Minnesota legislature in 1913 establishing legislative districts throughout the State. It was asserted that the act was in violation of the State constitution. There, as in the case at bar, it was urged that the equal protection clause of the Fourteenth Amendment to the Federal Constitution was also violated. The court deferred decision on the issues presented to it in order to give the 1959 legislature, the members of which were to be elected on November 4, 1958, an opportunity to take action. The following comment in the opinion indicates the reason for such deferment (p 188):

"It seems to us that if there is to be a judicial disruption of the present legislative apportionment or of the method or machinery for electing members of the State legislature, it should not take place unless and until it can be shown that the legislature meeting in January, 1959, has advisedly and deliberately failed and refused to perform its constitutional duty to redistrict the State."

The supreme court of New Jersey in *Asbury Park Press, Inc.,* v. *Woolley,* 33 NJ 1 (161 A2d 705), likewise withheld determination of the questions raised in a case challenging a reapportionment act, adopted by the legislature of the State, in order to afford a reasonable opportunity for legislative action. The case was cited by the supreme court of Colorado in its recent decision (rendered July 6, 1962) in the case of *Stein* v. *General Assembly of the State of Colorado,* 150 Colo — (374 P2d 66). After discussion of the practical problems involving legislative reapportionment of senators and representatives, the court, referring specifically to the decision of the supreme court of New Jersey, declined to intervene until the next general assembly of the State, the members of which will be chosen at the November election in 1962, has a reasonable opportunity to consider the issues raised with reference to reapportionment. The attitude of the court is indicated by the following excerpt from its opinion:

"We believe there should be no judicial intrusion into the legislative and executive affairs of the State, and we should be ever mindful of the necessity of preserving the integrity and independence of the coordinate branches of government. We should, therefore, exercise an appropriate degree of restraint to see if they will carry out their duties. Only if both they and the people fail to act will it become a judicial function to step into the void.

"It has been called to our attention that in Tennessee on June 22, 1962 (USDC No 2724 Nashville Div, 206 F Supp 341) a 3-judge Federal court acting pursuant to the mandate of *Baker* v. *Carr, supra* (the landmark case from which flows all current reapportionment litigation) decided to retain jurisdiction to give the Tennessee legislature 'an opportunity at its 1963 session to enact a fair and valid reapportionment'. As authority for so doing the court cited similar procedures in *McGraw* v. *Donovan* (DC Minn,

1958), *supra, Toombs* v. *Fortson* (ND Ga, May 25, 1962), 205 F Supp 248 (involving the legislature of Georgia); and the recent Alabama case of *Sims* v. *Frink* (DC Ala), 205 F Supp 245."

It is somewhat significant that the Colorado court in its opinion discussed at some length the suggested procedure involving the election of members of the legislature at large, and in doing so pointed out practical objections to such course. It will be noted also that the decisions of State and Federal courts emphasize the necessity for deliberate action in dealing with legislative enactments claimed to be in violation of constitutional provisions. The situation in the controversy before us is far more complicated in that the attack is made on an amendment to the State Constitution, initiated by petition and adopted by the people of the State. If the section providing for senatorial districts and the election of senators therefrom is stricken from the Constitution obviously extremely grave questions will thereby be raised. It must be said also that there is no emergency or threatened crisis rendering hasty action imperative. No reason has been or can be assigned for the contemplated refusal to adopt the realistic method of procedure suggested by the decisions of other courts, above cited.

Attention has been directed to the situation that will be created if this Court enters immediately a judgment, as proposed by Mr. Justice Kavanagh in his opinion, striking from the Constitution the apportionment of senatorial districts within the State. As before pointed out, the amendment of 1952 increased the number of senators from 32 to 34 and materially changed the limits of districts. In the 4 elections that have followed since the adoption of that amendment senators have been chosen from the districts as so specified, including, of course, the members of the present senate. No possible claim can be made that

they represent districts created by act of the legisla-ture in accordance with the original provisions of the Constitution of 1908. If the existing districts are abolished, a result necessarily following expunging article 5, § 2, from the fundamental law of the State, the conclusion cannot be avoided that the offices the present senators were chosen to fill will no longer exist.

The proposed judgment set forth in Mr. Justice KAVANAGH's opinion provides for the issuance of an injunction against the defendant secretary of State to restrain the primary election of candidates for the office of State senator, which election is now set under the general law of the State for August 7, 1962. Such an injunction will clearly rest on the theory, if the proposed judgment is entered, that the office of State senator as now existing is abolished. However, the proposed judgment would continue in office the present members of the senate until December 31, 1962, and the senate would be permitted to function as a *de facto* body. It thus appears that the members of the *de facto* senate will, under the proposed judgment, be acting not by virtue of their election by the people of the various senatorial districts created under the amendment of 1952 but by fiat of the majority of the members of this Court participating in the decision of the case. The query naturally suggests itself as to the authority of this Court to thus create one of the houses of the State legislature. The proposed judgment entry is not consistent with any possible theory that an incumbent of an office existing under a law adjudged to be invalid may continue to function on the ground that he may be regarded as a *de facto* official. The general rule of law unquestionably is that there can be no *de facto* officer unless there is a *de jure* office.

The decision of the supreme court of the United States in *Norton* v. *Shelby County,* 118 US 425 (6

S Ct 1121, 30 L ed 178), above cited, declares the general rule of law on the issue with reference to the status of a prior incumbent of an office previously existing under a statute adjudged unconstitutional. Decisions involving the status of one assuming to perform the duties of an existing office obviously are not in point. Mr. Justice Souris directs attention to *Attorney General, ex rel. Dingeman,* v. *Lacy,* 180 Mich 329, in support of the claim that an adjudication that an act creating a particular office is invalid does not prevent the incumbent from continuing to act with a *de facto* status. The Court did not so hold in that decision. Involved was an act of the State legislature undertaking to create a domestic relations court in counties having a population of more than 250,000. It applied to Wayne county only and was adjudged invalid because in conflict with article 5, § 30, of the State Constitution (1908) forbidding local acts if a general act can be made applicable and further requiring the approval of all local acts by electors of the district to be affected. It was also held that the provisions of the State Constitution relating to the jurisdiction of circuit and probate courts were violated. The purpose of the act was to relieve the circuit court of Wayne county of a portion of its burden. The domestic relations court had functioned for some time prior to adjudication, and the Court declined to hold invalid *prior* judicial acts within the scope of the circuit court jurisdiction. The gist of the decision in this respect is indicated (p 342) in the following statement:

"Inasmuch as respondent, under the authority of a legislative enactment, assumed to exercise a portion of the jurisdiction of the circuit court, which is a constitutional court, we are of opinion that such of his judicial acts as are within the jurisdiction of the circuit court should be considered as those of a *de*

*facto* judge, not open to question upon jurisdictional grounds."

It will be noted that only acts that might have been performed by a circuit judge were declared to be valid. Furthermore, the Court did not hold that the defendant judge was entitled to *continue* to act on the theory of a *de facto* status. When the judgment was entered declaring nonexistent the office that the defendant had held his functions ceased. He was a *de facto* judge as to prior acts only. The case is not authority for any possible claim that if judgment enters invalidating the section of the Constitution under which the present senators were chosen such members may continue to act for the purpose of creating a *de facto* senate. Such a claim has no basis in either law or logic.

We have called attention to certain aspects of the proposed judgment as set forth in Mr. Justice KAV-ANAGH's opinion for the purpose, among others, of emphasizing the serious nature of the problem with which we are confronted. Judicial interference, as emphasized in decisions above cited, in controversies of the nature here involved, should if possible be avoided. Careful consideration and action are imperative. It must be borne in mind that we are dealing with an attempt to strike from our Constitution provisions that have been placed there by the people of the State in whom all political power is inherent. Bearing in mind the origin of the amendment of 1952, is there any basis for a suggestion that there was any purpose of "invidious discrimination" involved?

As hereinbefore stated, the purpose of the people in the adoption of the amendment in question was the formulation of a definite plan deemed proper for the protection of the people of the State and of all sections of the State. The fundamental law of the State,

like that of the nation, involves a series of checks and balances essential in all representative government. The underlying purpose and plan of the amendment must be determined by reference to all of the provisions thereof. Provision was made that members of the house of representatives, 110 in number, should be selected from districts established on the basis of population. Such provision insured that the more populous sections of the State should not be discriminated against by unfair legislation, nor is there any claim that such has occurred. Protection from such discrimination was assured to plaintiff and others in like situation. On the other hand it was recognized that the more thinly populated sections of the State should not be overlooked. It has been repeatedly declared, and is not denied in this case, that in the interests of the general welfare the situation with respect to all parts of the State in any plan for the election of members of the legislature should be given due consideration.

Mr. Justice Souris asserts that the present senatorial districts were established without any conceivable or rational basis. We disagree. How could such a plan be formulated other than by consideration of geographic divisions? The people of Michigan in adopting the amendment recognized the situation existing in different sections of the State, recognized the necessity for protecting all sections and all people against possible injustice, recognized the necessity for a definite plan that would accomplish that purpose, and acted accordingly. A bicameral legislature renders feasible such a plan. Plaintiff's objections to it are predicated in the final analysis on the desire to create a situation by virtue of which the legislature of the State may be controlled by numbers. The argument is that no apportionment act is valid unless resting on the population basis. It must be conceded, and it cannot be

denied, that population alone is not the controlling factor. To effect a desired and proper result there may be departure therefrom, a situation that obtains in government, national, State, and local. The underlying purpose sought to be obtained through the relief sought by plaintiff in this case is the obtaining of power on the basis of numbers. May the equal protection clause of the Fourteenth Amendment be successfully invoked to accomplish that purpose? We think not. Such was not the intent of the people of this country in the adoption of that amendment to the fundamental law of the nation.

There is no question here involved as to any violation of the Constitution of the State of Michigan. Justices Kavanagh and Souris have cited *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402); and *Williams* v. *Secretary of State,* 145 Mich 447. Each of said cases involved a statute, enacted by the legislature, found to be in conflict with the State Constitution. In neither case was any question raised as to the denial of the equal protection of the law.

In remanding the case to this Court for consideration and decision it is clear that the supreme court of the United States did not pass on the merits of the justiciable issue found to be present. The various opinions filed in *Baker* v. *Carr* may not be so construed. It is crystal clear that the purpose of the remand was to enable this Court to pass on the question whether plaintiff has made out a case entitling him to the relief sought. The burden of proving such right is, of course, on plaintiff. Such burden has not been borne. The people of Michigan may not be adjudged guilty of denying to plaintiff the equal protection of the laws.

For the reasons stated the validity of the provision of the Michigan Constitution assailed by plaintiff should be sustained and the petition for writ of mandamus should be dismissed.

DETHMERS and KELLY, JJ., concurred with CARR, C. J.

DETHMERS, J. (*dissenting*). I concur with what Mr. Chief Justice CARR has written and would add somewhat thereto.

An equal protection of the laws problem is not presented. Complaint is made of apportionment of senators on a basis such that the senator elected from plaintiff's district represents more electors than do senators from other districts. It is said that plaintiff's vote is thus debased or diluted. Plaintiff can vote for one candidate for senator and one senator represents his district. The same is true of every voting elector in the State, regardless of the population of his district. The rights of each elector in Michigan are, in that respect, no more nor less than plaintiff's, whatever the number of voters residing or voting with such elector in his district. If half the people in plaintiff's district were to move from it overnight, would plaintiff's rights in the respect here considered be doubled, or, if the direction of the move were reversed and the population of his district doubled, would his mentioned rights thereby be halved, and his vote debased or diluted accordingly? Would the degree or extent of his protection of the laws thereby be altered? He would still have 1 vote for senator and 1 senator representing his district. That is all he would have if he dwelt in a district less populous. Insofar, then, as the right of exercise of the franchise is concerned, there is no discrimination, no inequality, no vote debasement, no denial of the equal protection of the laws. So much for plaintiff's right to vote for and to have his district represented by 1 senator.

Even a dissenting opinion may, now and then, give rise to an interesting question or thought worthy of pursuit. Can it be, to paraphrase Mr. Justice

Frankfurter in *Baker* v. *Carr*, 369 US 186 (82 S Ct 691, 7 L ed 2d 663), that plaintiff's real or underlying complaint is that present apportionment of the senate deprives him of what he conceives to be his "proportionate share of political influence"? Concerning this, Justice Frankfurter went on to write (p 299): "This, of course, is the practical effect of any allocation of power within the institutions of government." To put the question another way, is it contended that if plaintiff's district were cut in two, with 1 senator apportioned to each half, this would serve to enhance his protection of the laws? He still could vote for but 1 senator, and but 1 would represent his district. Assuming, however, that an elector might say with accuracy that senate reapportionment on a strictly population basis, as distinguished from that now required by State Constitution, would result in transforming the present senate minority of adherents to his political faith and party into a senate majority, would it be denial of the Fourteenth Amendment equal protection of the laws to deny that elector such senate transformation? To pose the question is to highlight the ludicrousness of an affirmative answer. But if the mentioned senate transformation were accomplished by the proposed reapportionment, what, then, of the equal protection of the laws for electors of the opposite political faith or party? It is no answer for one to say that those of my political party are entitled to more protection of the laws because we are in the majority. It was precisely that which the Fourteenth Amendment protection of minorities was designed to prevent. It is obvious, then, that an equal protection of the laws question is not involved in this contemplation. In a republican form of government, guaranteed to every State by the Federal Constitution,[1] it is in the nature of things that with

---

[1] See US Const, art 4, § 4.—Reporter.

2 major parties occupying the field, exclusively, unless their strength be equal, one must, for the nonce, be the majority and the other the minority party in legislative halls. No constitutional rights of party members or other groups are thereby infringed upon nor are they thus denied the equal protection of the laws.

Or is the essence of plaintiff's complaint that the alleged malapportionment of the senate has worked for him, and others in Michigan similarly situated, a denial of the equal protection of the laws in that resultant legislative enactments have conferred lesser benefits or imposed greater burdens on them than upon others resident in less populous senatorial districts? This, at least, would present something in the nature of an equal protection of the laws question. Plaintiff's petition does not so allege nor is there aught in the record to show or establish it. The burden of proof in that respect rests on plaintiff. It has neither been undertaken nor sustained.

In *Brown* v. *Board of Education of Topeka,* 347 US 483 (74 S Ct 686, 98 L ed 873, 38 ALR2d 1180), the supreme court of the United States held that the equal protection clause of the Fourteenth Amendment prohibits States from maintaining racially segregated schools. On that same day it decided *Bolling* v. *Sharpe,* 347 US 497 (74 S Ct 693, 98 L ed 884), holding that racial segregation in the public schools of the District of Columbia is a denial of the due process of law guaranteed by the Fifth Amendment. It was the court's view that action which would violate the equal protection clause of the Fourteenth Amendment when perpetrated by a State could scarcely be squared with requirements of the Fifth Amendment's due process clause as relates to action by the Federal government. While the court did say that "equal protection of the laws" and "due process of law" are not always interchangeable phrases, it,

nevertheless, discerned such close relationship between the 2 concepts and similarity in effect and consequences as to cause the 2 to compel the same result with respect to the 2 like factual situations in the 2 noted cases. Cited as authority therefor was *Hurd* v. *Hodge,* 334 US 24 (68 S Ct 847, 92 L ed 1187). Can it be assumed, then, with the due process clause of the Fifth Amendment to the Constitution of the United States, relating to the Federal government, apparently seeming to the founding fathers to be left unoffended by the express provision of article 1, § 3, of that same Constitution for selection of 2 senators from each State, that, at a time when the United States senate continued, as now, to be so composed, it was intended by the adoption of the related equal protection clause of the Fourteenth Amendment, applicable to State governments, to thereby prohibit apportionment to the State senates on a similar basis, not keyed strictly to the population levels of the several senatorial districts? Sound reasoning forbids such conclusion. To give the Fourteenth Amendment such effect today is to recognize some subsequent amendment thereof accomplished by means other than those prescribed by the Constitution itself for its amendment.

That the United States supreme court has not deemed such to be the meaning and intent of the equal protection clause is evident enough from its unanimous opinion and decision in *Minor* v. *Happersett,* 21 Wall (88 US) 162 (22 L ed 627). There, the court held that the rights or privileges of suffrage were not within the meaning of the equal protection clause, pointing out (p 175) that, if they were guaranteed thereby, there would have been no occasion for adoption of the Fifteenth Amendment providing that the rights of citizens of the United States to vote shall not be abridged. The same may be said of the Nineteenth Amendment, providing for women's

suffrage. The fact of the adoption of these latter amendments reveals the national thinking that the Fourteenth had no such purpose or effect. See, also, the many Federal decisions cited in Mr. Justice ED-WARDS' opinion in 1960, when this case made its previous appearance before us, to the effect that the apportionment here under attack is not violative of the Fourteenth Amendment. That it is and always has been part and parcel of the plan for republican government in vogue not only in the government of the United States, but in most of the States, may also be observed from the facts and statistics and recital of the history of the subject set forth in that opinion. This is indicative of the national concept, throughout the decades, of republican government and the absence of involvements under the equal protection clause and of the concurrence therein of the United States supreme court. *Baker* v. *Carr, supra,* and *Scholle* v. *Secretary of State,* 369 US 429 (82 S Ct 910, 8 L ed 2d 1), are not holdings to the contrary on the merits. The mandate to this Court in *Scholle* was simply to reconsider this case in the light of *Baker* v. *Carr, supra.* In the latter, the court was careful to point out that it was not passing on the merits, but only on questions of jurisdiction, justiciability, and standing of appellants as proper parties. (See opinions of Justices Brennan, Douglas, and Stewart.) In fact, particular reference is made in Justice Stewart's opinion to *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3), relied upon and quoted by Mr. Chief Justice CARR herein, and, as noted by him, Mr. Justice Stewart wrote (p 266) that the court's decision in *Baker* v. *Carr* does not turn its back on *MacDougall* and like settled precedents. That must inescapably include the statement in *MacDougall* to the effect that political power is not a function exclusively of numbers and that the court would not deny to a State the power to

assure a proper diffusion of political initiative as between its thinly populated areas and those having concentrated masses, inasmuch as the latter carry a political weight at the polls not available to the former.

Mention is made of *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402), and *Williams* v. *Secretary of State,* 145 Mich 447. They held invalid apportionments made which were not in conformity with the requirements of the State Constitution in effect at that time for apportionment on a population basis. They are not determinative of the question of the validity of the relevant provision of the State Constitution now in effect.

When the framers of the Constitution of the United States provided for what they deemed to be a republican form of government, and guaranteed it equally to the States, they attempted no innovation with respect to formation of a congress composed of a house of representatives, to be elected approximately according to population, and a senate, consisting of members selected on a different basis, namely, 2 from each State regardless of the respective geographical sizes or populations of the States. They were following the pattern for legislative apportionment already in effect in the States, as it has been ever since in most of the States. That this was not through inadvertence but by design is evident enough from writings of the time when the Constitution was adopted and the course of action pursued since then throughout the country. The following excerpts from The Federalist are enlightening on the subject:

"It is a misfortune incident to republican government, though in a less degree than to other governments, that those who administer it may forget their obligations to their constituents, and prove unfaith-

ful to their important trust. In this point of view, a senate, as a second branch of the legislative assembly, distinct from, and dividing the power with, a first, must be in all cases a salutary check on the government. It doubles the security to the people, by requiring the concurrence of 2 distinct bodies in schemes of usurpation or perfidy, where the ambition or corruption of one would otherwise be sufficient. This is a precaution founded on such clear principles, and now so well understood in the United States, that it would be more than superfluous to enlarge on it. I will barely remark, that as the improbability of sinister combinations will be in proportion to the dissimilarity in the genius of the 2 bodies, it must be politic to distinguish them from each other by every circumstance which will consist with a due harmony in all proper measures, and with the genuine principles of republican government." Paper No 62.

Paper No 63 contains this statement:

"It may be suggested, that a people spread over an extensive region cannot, like the crowded inhabitants of a small district, be subject to the infection of violent passions, or to the danger of combining in pursuit of unjust measures. I am far from denying that this is a distinction of peculiar importance. I have, on the contrary, endeavored in a former paper to show, that it is one of the principal recommendations of a confederated republic."

In Paper No 51 the following is stated:

"It is of great importance in a republic not only to guard the society against the oppression of its rulers, but to guard one part of the society against the injustice of the other part. Different interests necessarily exist in different classes of citizens. If a majority be united by a common interest, the rights of the minority will be insecure. * * * Whilst all authority in it (Federal republic) will be derived from and dependent on the society, the society itself

will be broken into so many parts, interests and classes of citizens, that the rights of individuals, or of the minority, will be in little danger from interested combinations of the majority."

The above was preceded by the following:

"But it is not possible to give each department an equal power of self-defence. In republican government, the legislative authority necessarily predominates. The remedy for this inconveniency is to divide the legislature into different branches; and to render them, by different modes of election and diferent principles of action, as little connected with each other as the nature of their common functions and their common dependence on the society will admit."

These writings are indicative of the spirit and purpose that occasioned the method of congressional and legislative apportionment then existing in States, adopted for the Federal government and followed throughout the United States from then until the present.

Checks and balances and a diffusion of governmental powers have been the genius of our system and the mainstay of the liberties of the people and our free institutions throughout our national history. Whether it be those inhering in a Federal system with a division between and assignment of powers to the central government over subjects of national concern and reservation to sovereign States of those of a State and local character, or in the separation of powers between the 3 branches of the government in both the National and the State governmental structures, or in the creation of a bicameral legislative branch, with each house a check on the other, our people have continued to recognize in them the bastions of our freedoms. These are irritants, of course, to those, impatient of what they

deem to be the delays of democratic processes, who seek the greater efficiency, speed and forceful action said to be characteristic of governments with unfettered powers. Not so for those who continue in their devotion as defenders of freedom.

These, it is evident, were the considerations which prompted the people of Michigan in 1952 to adopt by a majority of almost 300,000 the present constitutional amendment for senatorial apportionment and to reject, at the same election, by an almost half-million-vote majority, a proposed amendment to apportion both houses according to population. Did the people, in their efforts to preserve a system of checks and balances partly for the purpose of protecting the interests of minorities in sparsely populated areas against organized blocs in metropolitan areas, thus create a system of senatorial apportionment so unreasonable, irrational, and discriminating as to violate the spirit of the equal protection clause? I am persuaded that they did not. To quote from the conclusion of the brief of intervening defendants:

"Article 5 of our State Constitution, as amended in 1952, merely establishes a reasonable, rational, and permissible system of checks and balances in State government. It has been said that 'liberty means definitely limiting the power of the sovereign, whether that sovereign be a king or a majority,' and it is the genius of the American people that in formulating their Constitutions, they chose 'to guard against excesses' of such majority, and to exercise voluntary self restraint."

Interestingly enough, the present constitutional provision does not, as sometimes thought, provide for an apportionment and election of senators on merely an area basis. Area is a factor, but representation in the senate is very considerably weighted toward the population concept. It is not under rural control. Out of the total of 34 senators,

20 represent urban areas containing urban communities of 100,000 or more persons. Sixty-four per cent of the senators represent approximately 1/3 of the area—that is, the more populous area—of the State. The senate apportionment is manifestly a combination of the population and area considerations, with compromise and adjustment to insure a check and balance system for the protection of all sections of the State and, as well, of all people within it. The Constitution of the United States was and is a compromise. The Constitution of the State of Michigan is a compromise. The history of representative government in this country and elsewhere is a history of compromise. It is under despotism that the necessity for compromise ceases. Unlimited monarchs, dictators and other absolute rulers often have felt no need to bother with compromise. The same might be true under a system styled by Jefferson as an "elective despotism", where majority rule is unfettered by constitutional restraints. Not so here where constitutional guaranties and the checks and balances of governmental structures are expressly designed to protect minorities and individuals against unrestrained majorities.

When the object and purpose of combining both population and area factors into an apportionment formula are to afford the checks and balances so essential to continued freedom and protection of the different peoples and sections of the State, it is no valid criticism to say that neither population nor area equality or uniformity was accomplished, so long as that main object and purpose of checks and balances and preservation of rights of minorities and those in sparsely populated areas are subserved. Such is the result obtained in Michigan under the existing State constitutional provision.

The analogy of the Federal congress is dubbed inapt. Point is made that the Constitution of the United States was a compact between sovereign States which would not have agreed upon union without the compromise providing for equal representation in the senate for each State regardless of population or size, while, in contrast, local units of government in Michigan are creatures of the State which are not and never were sovereign entities whose consent was essential to formation of the State. This overlooks, incidentally, the subsequent admission to the Union, on the same senate apportionment basis, of 37 States which, with the exception of Texas, had not been equal sovereignties subscribing to a compact. Regardless of all that, however, and whatever may be the historic reasons and distinctions, in practical, everyday operation, the effects and consequences to the rights of people resulting from senate apportionment on a nonpopulation basis are the same whether it exists in the Federal or State government. Even though the Federal senate apportionment in disregard of population is constitutional because of the express provision for it in article 1, § 3, and the fact that the Fourteenth Amendment does not apply to the Federal government, it constitutes no more, but certainly no less, a denial of the equal protection of the laws to people than does such apportionment to a State senate. This Court, today, in effect, may announce that present apportionment to the United States senate works a constitutionally permissible denial of the equal protection of the laws to people. It is an announcement in which I do not join.

I concur with Mr. Chief Justice CARR's opinion in its entirety and in his conclusion that plaintiff's petition should be dismissed.

Carr, C. J., and Kelly, J., concurred with Deth-mers, J.

Kelly, J. (*dissenting*).  I not only concur with but completely indorse the opinions of Chief Justice Carr and Justice Dethmers.  Plaintiff states that this "may well be the most significant case ever to come before this Court," and with that thought I do not disagree and because of its importance and significance I am making the following addition to what has already been presented by Chief Justice Carr and Justice Dethmers.

The former attorney general of Michigan (Paul L. Adams, now Supreme Court Justice, who has disqualified himself because he was attorney general at the time of the original hearing) took an opposite position at the original hearing to the position taken by our present attorney general, Frank J. Kelley, at this rehearing, as is evidenced from Justice Kava-nagh's 1960 opinion setting forth the following as the contention of the secretary of State and the attorney general (360 Mich, pp 11, 12):

"(2) Senatorial districting on a basis of area does not deny a republican form of government.

"(3) The equal protection of the laws provision of the Fourteenth Amendment to the United States Constitution is not violated, since—

"(a) There is no discrimination within a unit;

"(b) Area representation is proper and valid;

"(c) The Negro voting cases do not apply to the question; and

"(d) Constitutions of States seeking admission to the Union, and providing for legislative apportionment on some basis other than population, have been approved by congress and the president subsequent to the adoption of the Fourteenth Amendment to the United States Constitution.

"(4) The due process clause of the Fourteenth Amendment to the United States Constitution is not violated as—

"(a) Area representation does not violate the due process clause of the United States Constitution; and

"(b) Area representation conforms with our democratic traditions.

"(5) To forbid area representation would require the elimination of similar representative methods throughout our democratic system such as representation on—

"(a) The county board of supervisors;

"(b) City precincts; and

"(c) Other levels of area representation.

"(6) The relief prayed for by plaintiff cannot be granted for the following reasons:

"(a) If this Court declares the 1952 amendment to article 5 of the Michigan Constitution (1908) invalid, there will remain no legislative body either *de jure* or *de facto* with power to rearrange senatorial districts and reapportion the legislature; * * *

"(e) The plaintiff has an adequate remedy by seeking amendment of the State Constitution by vote of the electors."

I agree with the attorney general and secretary of State's position and with the development of the point by Chief Justice CARR, namely, that if this Court declare the amendment invalid, "then the State of Michigan will necessarily be left without a State senate and, hence, without a legislature that can function under the Constitution. Striking from the fundamental law of Michigan the provision for designated senatorial districts will obviously terminate the existence of such districts. This Court is without power to give to those previously elected therefrom the status of *de facto* incumbents of offices that no longer exist."

While Attorney General Kelley joins plaintiff and petitioner in his request that this Court declare that article 5, § 2, of the Michigan Constitution, violates the equal protection clause of the Fourteenth Amendment, he disagrees with plaintiff-petitioner as to the remedy or relief that should be granted.

Plaintiff-petitioner requests this Court as follows:

"We fervently pray for immediate relief, as above and earlier discussed—that a writ of mandamus issue, commanding the defendant not to issue 1962 election notices for State senators  *  *  *  pending an opportunity for enactment of timely, valid reapportionment legislation by the 1962 Michigan legislature, in failure of which the defendant further be directed to declare and conduct the 1962 elections for State senators on an at-large basis."

Attorney General Kelley, evidently realizing the injustice to the voters and the confusion that would result from granting petitioner's request, makes plain to this Court that he disagrees with petitioner by stating:

"The attorney general cannot subscribe to the request of petitioner that the August 1962 primary be enjoined for the reason that the legislature should be given sufficient time to reapportion the senate and to allow judicial review to be sought by an aggrieved party."

Endeavoring to sustain his contention that the majority opinion (360 Mich 1) did not decide "on the merits," plaintiff states: (1) "In short, that Justice EDWARDS did not express a majority judgment on the merits of this cause that the districts were valid under the tests of the Fourteenth Amendment"; and (2) "If Justice EDWARDS' remarks are now taken to have been on the merits, they obviously express erroneous conclusions."

I disagree with both of plaintiff's contentions and direct attention to the following from Justice Edwards' opinion (pp 92, 93, 96–98, 101, 103–106):

"The interpretation of the Fourteenth Amendment equal protection clause contended for herein would forbid any State from having a constitutional scheme for legislative representation in either house on any basis other than one which results in substantial voting equality.

"No matter what the future may bring in relation to this contention, it certainly was not the interpretation of the Fourteenth Amendment placed thereon by the States which ratified it. Nor is it that adopted by the United States congress subsequently in admitting States to the Union. Nor is it the interpretation current among the majority of the 50 States of the Union at present. * * *

"Of the 37 States in the Union in 1868, nine had constitutional provisions for election of representatives to at least 1 of the houses of their legislatures which based representation on constitutionally described legislative districts with constitutionally allocated representation without any pretense of guarantee of equality of popular representation. These States are Vermont, Rhode Island, Connecticut, New Hampshire, New Jersey, Delaware, Maryland, South Carolina, and Nevada.

"The resulting disproportion in popular representation was in some instances far greater than that complained of herein. In the instances of Vermont, Connecticut, and Rhode Island (all States which ratified the Fourteenth Amendment), representation in 1 house was based upon a political unit, with geographic boundaries, known as a town or city. * * *

"Without taking into account the major factor of disproportion occasioned by failure of legislatures to follow State constitutional commands to reapportion, or such relatively minor constitutional factors of disproportion as moiety clauses, it still appears that 20 of the 37 States constituting the Union at the

time of the adoption of the Fourteenth Amendment had in their own constitutions provisions which prevented at least 1 legislative house from being based upon the principle of equality of popular representation.

"Between 1868 and the present time, 13 additional States have entered the Union.

"As a prerequisite to such entry, the US Const, art 4, § 3, requires congressional approval. Historically, congress has required States applying for admission to submit their proposed constitution. See *Coyle* v. *Smith*, 221 US 559 (31 S Ct 688, 55 L ed 853). Typical of the form of approval is the statute by which the constitution of the proposed State of Hawaii was approved and Hawaii was admitted.  *  *  *

"Of the 13 States whose constitutions were approved for admission, 8 such constitutions (for the States of Arizona, Alaska, Hawaii, Idaho, Montana, New Mexico, Oklahoma, Utah) contained provisions for election of at least 1 legislative house which fell into 1 of the 3 categories of disproportion discussed above.  *  *  *

"The recent congressionally approved constitutions of the new States of Alaska and Hawaii contain State senatorial provisions which call for specific districts described largely on a geographic basis, with a resulting substantial inequality of popular representation. In Alaska, the newly elected State senator from the Anchorage-Palmer district represents 87,748 constituents, as compared with the senator from Barrow-Kobuk who represents only 5,705—a ratio of 15:1.  *  *  *

"Thus a majority of the States of the Union in 1868, a majority of the States which joined the Union subsequently, and a majority of the States at the present time, had, or have, in their constitutions provisions as to 1 legislative house which have the effect of denying substantial equality of voting strength to some voters (generally in more populous

areas), as compared to other voters (generally in thinly populated areas).

"Many, if not most, of such provisions in other States are directly comparable in constitutional principle and resulting disproportion to the 1952 amendments to Michigan's Constitution.

"What the 1952 amendments did was to draw senatorial electoral districts based on geographic areas described in terms of counties, or groups of contiguous counties, or subdivisions of a single county. As we have seen, this has many parallels in the history of other States from the time of the adoption of the Fourteenth Amendment down to date. The system employed appears to be a variation of the 1-senator-per-county system which is common to many other States.

"We note the suggestion that the 1-senator-per-county system may be a constitutional classification where the variation is not. We reject this reasoning, however. The 1-senator-per-county system would in Michigan produce ratios of disproportion exceeding 1,000:1. We do not think the Fourteenth Amendment may be regarded as forbidding a variation from the 1-per-county system in the direction of popular representation.

"The real attack upon the classification of Michigan voters resulting from the 1952 senate amendments, however, is upon its purpose and its result. It seems clear to us that the general purpose of the disproportionate constitutional provisions which we have reviewed was, and is, to seek to give more thinly populated areas of a State a specific check upon the concentrated political power of the more populous areas. Considering that the amendment with which we deal in this case was adopted at an election wherein another amendment (Proposal No 2), designed to provide equality of popular representation in the Michigan senate, was defeated, it seems clear that this likewise was the purpose of the majority of Michigan voters in 1952.

"This Court does not determine the wisdom of the decisions made by the people of Michigan in adopting their Constitution. By its terms, all political power is inherent in them (Mich Const [1908], art 2, § 1), subject only, of course, to the United States Constitution.

"However distasteful to some of us the rationale of the majority of voters in 1952 may be as support for the classification of senatorial districts which resulted from the 1952 amendment, it clearly has been regarded to date as acceptable under the United States Constitution by the United States supreme court.

"The United States supreme court, in a case in which the classifications in a tax statute and ordinance were attacked as violative of the equal protection clause of the Fourteenth Amendment, established this test as to classification:

" 'Equal protection does not require identity of treatment. It only requires that classification rest on real and not feigned differences, that the distinction have some relevance to the purpose for which the classification is made, and that the different treatments be not so disparate, relative to the difference in classification, as to be wholly arbitrary. *Cf. Dominion Hotel, Inc.,* v. *Arizona,* 249 US 265 (39 S Ct 273, 63 L ed 597); *Great Atlantic & Pacific Tea Co.* v. *Grosjean,* 301 US 412 (57 S Ct 772, 81 L ed 1193, 112 ALR 293); *New York Rapid Transit Corp.* v. *City of New York,* 303 US 573 (58 S Ct 721, 82 L ed 1024); *Skinner* v. *Oklahoma, ex rel. Williamson,* 316 US 535 (62 S Ct 1110, 86 L ed 1655).' *Walters* v. *City of St. Louis,* 347 US 231, 237 (74 S Ct 505, 98 L ed 660).

"In *MacDougall,* 335 US 281 (69 S Ct 1, 93 L ed 3), the court said (p 284):

" 'It would be strange indeed, and doctrinaire, for this court, applying such broad constitutional concepts as due process and equal protection of the laws, to deny a State the power to assure a proper diffusion of political initiative as between its thinly

populated counties and those having concentrated masses, in view of the fact that the latter have practical opportunities for exerting their political weight at the polls not available to the former.'

"In the face of this history and this precedent, we find no way by which we can say that the classification we are concerned with herein is 'wholly arbitrary,' and hence repugnant to the Fourteenth Amendment of the United States Constitution as the United States supreme court has construed it to this date."

Plaintiff requests this Court to notify the legislature that unless it enacts "timely, valid reapportionment legislation" the 1962 elections for State senators will be conducted on an at-large basis.

Plaintiff asks this Court to issue a writ of mandamus "commanding the defendant not to issue 1962 election notices for State senators," evidently realizing that he is asking this Court to emasculate and render powerless the Michigan election laws, and more particularly CLS 1956, § 168.163, as amended by PA 1957, No 125 (Stat Ann 1961 Cum Supp § 6.1163), which provides:

"That the secretary of State and the various county clerks shall receive nominating petitions for filing in accordance with the provisions of this act up to 4 o'clock, eastern standard time, in the afternoon of the seventh Tuesday preceding the August primary."

Plaintiff is asking this Court to declare null and void the people's mandate as expressed in their Constitution that their senators be elected from senatorial districts.

Why this haste? Why this drastic action? Why ask this Court to not only declare null and void the present plan of apportionment adopted almost 10 years ago by the people of our State by the overwhelming majority of 294,000, but, also, to order

an election that will be contrary to the constitutional mandate? A plan that was directed in the same direction as now urged by plaintiff was defeated by over 490,000.

Repeated references have been made to *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663). Plaintiff asks the question whether Michigan can be distinguished from Tennessee, and states: "Justice Harlan, for example, would have distinguished *Scholle* from *Baker* on several counts."

I wholeheartedly agree with Justice Harlan because: (1) Plaintiff's claim concerns only one body of the legislature while the Tennessee claim was in regard to both; (2) Plaintiff attacks affirmative action of Michigan voters, while the Tennessee attack was on legislative inaction; (3) Michigan's apportionment conforms to the Michigan Constitution while Tennessee's legislation apportionment conflicts with the Tennessee constitution.

The Tennessee plaintiff had much greater reason to complain than our present Michigan plaintiff— and yet, the Federal judges in the Tennessee case of *Baker* v. *Carr* refused to do what plaintiff is asking this Court to do, as is ably set forth in Chief Justice CARR's opinion.

Tennessee will hold an election under the Tennessee election laws in 1962, but plaintiff insists that that must not happen in Michigan. I do not agree with plaintiff's contention in this regard.

I concur with Chief Justice CARR and Justice DETHMERS' opinions in their entirety and with their conclusion that plaintiff's petition should be dismissed.

CARR, C. J., and DETHMERS, J., concurred with KELLY, J.

SOURIS, J. (*concurring*). The facts may be found in the dissenting opinion of Mr. Justice KAVANAGH, reported at 360 Mich 1, on the occasion of our first consideration of this case. The principal issue presented for our determination then and now is whether the 1952 amendments to sections 2 and 4 of article 5 of the Constitution of 1908 offend the equality clause of the Fourteenth Amendment to the United States Constitution. By the 1952 amendments Michigan's senatorial districts were territorially described, each district to be represented by a single senator, and with no provision for subsequent rearrangement of the designated districts. Plaintiff claims that the senatorial districts thus constitutionally established in 1952 were and are unconstitutionally discriminatory against him in violation of the equality clause of the Fourteenth Amendment for the reason that the arrangement of districts was palpably irrational and arbitrary, indeed that it was deliberately designed to accomplish the discriminatory result achieved, to-wit, constitutional permanence of pre-existing grossly disproportionate senatorial representation of residents of some areas, in one of which plaintiff resides, in favor of residents of other areas.

Our prior opinions having created some confusion on appeal to the United States supreme court (see opinions on remand in *Scholle* v. *Secretary of State,* 369 US 429 [82 S Ct 910, 8 L ed 2d 1]), a brief summary of them may be of some value. On our first consideration of this case, only 3 of the members[1] of this Court held, in dissent, that the 1952 constitutional amendments invidiously discriminated

_____

[1] Two, of the 8 Justices who participated in the first hearing of this case no longer are members of this Bench. One of them, Mr. Justice EDWARDS, wrote the controlling opinion and the other, Mr. Justice TALBOT SMITH, wrote one of the dissenting opinions.

against plaintiff and other residents of the State in violation of the equality clause and that the Court had the power and the duty to act. A fourth member of the Court agreed that there was unconstitutional discrimination, but he concluded that there was no judicial power to right that wrong. The remaining 4 Justices concluded that prior Federal cases[2] had considered similar claims of unconstitutional discrimination and rejected them, thereby compelling their holding that the senatorial district arrangement here involved was not repugnant to the Fourteenth Amendment as they conceived the United States supreme court to have construed it to that date. 360 Mich 106 and 124.[3] Five Justices of this Court having held either that the Court lacked the power to grant relief or that, under prior United States supreme court decisions, plaintiff was not entitled to relief, the petition for writ of mandamus was dismissed. Plaintiff appealed to the United States supreme court and now, on remand by man-

---

[2] *Colegrove* v. *Green,* 328 US 549 (66 S Ct 1198, 90 L ed 1432); *Cook* v. *Fortson,* 329 US 675 (67 S Ct 21, 91 L ed 596); *MacDougall* v. *Green,* 335 US 281 (69 S Ct 1, 93 L ed 3); *South* v. *Peters,* 339 US 276 (70 S Ct 641, 94 L ed 834); *Remmey* v. *Smith,* 342 US 916 (72 S Ct 368, 96 L ed 685); *Anderson* v. *Jordan,* 343 US 912 (72 S Ct 648, 96 L ed 1328); *Kidd* v. *McCanless,* 352 US 920 (77 S Ct 223, 1 L ed 2d 157); *Radford* v. *Gary* (WD Okla), 145 F Supp 541, affirmed 352 US 991 (77 S Ct 559, 1 L ed 2d 540); *Hartsfield* v. *Sloan,* 357 US 916 (78 S Ct 1363, 2 L ed 2d 1363); *Matthews* v. *Handley* (ND Ind), 179 F Supp 470, affirmed 361 US 127 (80 S Ct 256, 4 L ed 2d 180).

[3] If there be confusion in Washington concerning our prior opinions, candor compels our admission that it exists as well in Lansing. Our Chief Justice says today that the prior controlling opinion, with which he specially concurred, held only that the Court lacked jurisdiction and the issue raised was not justiciable. See pp 196, 197, *supra.* Mr. Justice Harlan read that opinion as I do, saying that it "did not so much as mention questions pertaining to the 'jurisdiction' of the court, the 'standing' of the appellant, or the 'justiciability' of his claim." *Scholle* v. *Secretary of State,* 369 US 429, 432. He concluded, as do I, that the controlling opinion, and those who concurred in it, decided against plaintiff on the merits in accordance with their then current views of the United States supreme court's prior construction of the Fourteenth Amendment.

date of supreme authority, 369 US 429 (82 S Ct 910, 8 L ed 2d 1), we again consider, but this time in the light of *Baker* v. *Carr,* 369 US 186 (82 S Ct 691, 7 L ed 2d 663), plaintiff's claim that the 1952 amendments violate his Federal constitutional right to equal protection of the laws.

Whatever doubts remain in the wake of the majority opinion by Mr. Justice Brennan in *Baker* v. *Carr* (see concurring and dissenting opinions therein and subsequent Federal and State cases[4]), it seems certain to me that it authoritatively disposed of all of the grounds articulated by our majority in previously denying this plaintiff the relief he seeks. There can be no continuing doubt that the controversy presented is justiciable and that the Federal cases read by some of my Brothers to grant constitutional immunity to inequalities of suffrage such as is here involved, do not so hold. Nor can there be any doubt, in the light of language contained not only in Mr. Justice Brennan's opinion for the majority in *Baker* v. *Carr* but also in other opinions filed in that case, both concurring and dissenting, that the traditional standards for determining the existence of discrimination in violation of the equality clause applicable to other claims of invidious discrimination will be applied by the supreme

---

[4] *Caesar* v. *Williams* (April 3, 1962), 84 Idaho — (371 P2d 241); *Sims* v. *Frink* (DC Ala, April 14, 1962), 205 F Supp 245; *Scholle* v. *Secretary of State* (April 23, 1962), 369 US 429 (82 S Ct 910, 8 L ed 2d 1); *Maryland Commission* v. *Tawes* (April 25, 1962), 228 Md 412 (180 A2d 656); *Sanders* v. *Gray* (DC Ga, April 28, 1962), 203 F Supp 158, appeal granted June 18, 1962, *but* motion to advance denied, 370 US 921 (82 S Ct 1564, 8 L ed 2d 502); *Wisconsin* v. *Zimmerman* (Wis, May 23, 1962), 205 F Supp 673; *Maryland Commission* v. *Tawes* (May 24, 1962) Anne Arundel county circuit court, Maryland; *Toombs* v. *Fortson* (ND Ga, May 25, 1962), 205 F Supp 248; *W.M.C.A., Inc.,* v. *Simon* (June 11, 1962), 370 US 190 (appeal from NY DC SD, 202 F Supp 741) (82 S Ct 1234, 8 L ed 2d 430); *Moss* v. *Burkhart* (Okla, June 19, 1962), 207 F Supp 885; *Baker* v. *Carr* (MD Tenn, June 22, 1962), on remand from 369 US 186, 206 F Supp 341.

court in determining whether inequalities of suffrage such as plaintiff here asserts violate his rights to equal protection of the laws.

No Federal bar to relief now exists, if it ever did, assuming a majority of this Court finds, as I think we must, the existence of invidious discrimination against plaintiff. *Baker* v. *Carr, supra.* Nor does any State policy bar relief, for in this State the Court has been quick to strike down invidious discrimination in suffrage cases such as this where violations of our State Constitution have been proved. *Board of Supervisors of Houghton County* v. *Secretary of State,* 92 Mich 638 (16 LRA 432); *Giddings* v. *Secretary of State,* 93 Mich 1 (16 LRA 402); and *Williams* v. *Secretary of State,* 145 Mich 447. We must be at least as quick when contempt for supreme law permeates any aspect of our electoral process such as has been proved convincingly to be the case here.

Too much already has been written concerning the details of the 1952 amendments and their effect upon the rights of our citizens to equality in the chambers of the State's senate. For these details, reference must be made to the earlier dissenting opinions of Mr. Justice KAVANAGH and Mr. Justice TALBOT SMITH, 360 Mich 1–84. In both opinions the "well developed and familiar"[5] judicial standards under the equality clause were applied and were found violated by the 1952 amendments. In 1960 Justices KAVANAGH and SMITH sought, but did not find, any rational basis for the arrangement of senatorial districts made by the 1952 amendments. Nor could they conceive of any recognizable basis upon which the classification could be justified. Mr. Justice SMITH put it this way:

---

[5] *Baker* v. *Carr,* 369 US 186, at p 226.

"We have sought in vain to find some formula or formulae, even roughly approximate, competent to explain the groupings of counties and parts of counties into senatorial districts. It is impossible. The system, if such it is, defies explanation. Even the defendants in their briefs and appendices offer no more than the iteration and reiteration that this is representation by geographical area. But representation by geographical area, without more, is not enough. If it were, any gerrymander would be valid because the gerrymander always represents some geographical area, however grotesque." 360 Mich 1, at p 56.

However done, the result in 1960, based upon 1950 census figures, was grossly disproportionate representation in our State senate, the ratio of population of the smallest senatorial district to the largest being 1 to 6.5, and 2/3 of the members of the senate representing less than 1/2 the people in the State. Mr. Justice KAVANAGH concluded that the 1952 amendments were palpably arbitrary, discriminatory, and unreasonable. Mr. Justice TALBOT SMITH concluded:

"There is no recognizable unit employed in the classifications made. We have no more than an arbitrary division of the State into areas. At the best it is wholly capricious. At the worst, it is deliberate. In either event it is wholly indefensible." 360 Mich 1, at p 75.

Defendants' "iteration and reiteration that this is representation by geographical area" without specification of determinable basis therefor has given way on remand to intervenors' claim that the constitutional arrangement of senatorial districts "gives the more thinly-populated rural areas of the State a specific check upon the concentrated political power of densely-populated industrial urban centers." As a statement of result, none could quar-

rel with that. Based upon the 1960 census, the "specific check" of 1 thinly populated rural area upon the concentrated political power of a densely populated industrial urban center (in which plaintiff resides) is measured now by a ratio of population between the two of 1 to 12–1/2. That this is not an isolated example of disparity in senatorial representation is evident from the fact that 53% of the State's population is represented by only 10 of the 34 State senators, 29% of their number.

Whatever the result, the fact remains that neither the intervenors nor my Brothers who have written to dismiss plaintiff's petition has suggested *any* determinable basis for the classification here involved. Assuming *arguendo* the constitutional permissibility of the objective of the classification posited by the intervenors, that is not enough. There must also be some basis, rational, not arbitrary, for determining the classes; yet none has been even suggested.

The difficulty does not end at this point. In addition to a permissible objective of classification, and some rational, not arbitrary, basis therefor, I have always assumed that none would deny there were limits even then upon the discrimination between classes the equality clause would accommodate. Search as I have in the briefs and in the opinions urging dismissal, I find not even tacit recognition of the existence of such limitation, let alone its discussion.

In short, Mr. Justice KAVANAGH and Mr. Justice TALBOT SMITH, with whom I concurred, on original decision of this case before *Baker* v. *Carr* and its Federal and State progeny (see footnote 2), applied the "well developed and familiar" judicial standards of the equality clause to the facts of the case and found the 1952 amendments to §§ 2 and 4 of article 5 of Michigan's Constitution invidiously discrimina-

tory and void. But even after *Baker* v. *Carr* pointed the way to decision in this case on remand, briefs and opinions have been written which seem to deny the happening of judicial events since March 26, 1962. Indeed, in the teeth of the United States supreme court's remand of this case "for further consideration in the light of *Baker* v. *Carr*" (among the *holdings* in which is that plaintiffs' complaint stated a cause of action under the equality clause upon which they would be entitled to appropriate relief if the proofs sustain their allegations, allegations similar to those found here if the United States supreme court's statement of *Baker's Case* may be accepted as accurate),—in the teeth of such remand, 1 member of this Court begins his opinion by denial that there is presented here an equal protection of the laws problem.[6] The point is that meaningful application of the equality clause to the facts of this case requires discussion of the basis of the classification, its uniformity in application, its relevance to the objective of classification, and the limits of permissible discrimination. This the prior dissenting opinions did, and did well, even before *Baker* v. *Carr*, but no answers to their conclusions have yet been made or even attempted. That the standards applied in those dissents were the proper ones is clearly evident from the opinions in *Baker* v. *Carr*.

Mr. Justice Brennan established the standards for the majority of the court at 369 US 186, p 226:

"The question here is the consistency of State action with the Federal Constitution. * * * Nor

[6] Even after having earlier concurred in that portion of the prior controlling opinion that ends as follows:

"In the face of this history and this precedent, we find no way by which we can say that the classification we are concerned with herein is 'wholly arbitrary,' and hence repugnant to the Fourteenth Amendment of the United States Constitution as the United States supreme court has construed it to this date." 360 Mich 1, at p 106.

need the appellants, in order to succeed in this action, ask the court to enter upon policy determinations for which judicially manageable standards are lacking. Judicial standards under the equal protection clause are well developed and familiar, and it has been open to courts since the enactment of the Fourteenth Amendment to determine, if on the particular facts they must, that a discrimination reflects *no* policy, but simply arbitrary and capricious action."

Mr. Justice Douglas, in his concurring opinion, at pp 244, 245, applied the "traditional test under the equal protection clause", citing *Skinner* v. *Oklahoma, ex rel. Williamson,* 316 US 535, 541 (62 S Ct 1110, 86 L ed 1655), and quoting from *Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 US 483, 489 (75 S Ct 461, 99 L ed 563), to the effect that "the prohibition of the equal protection clause goes no further than the invidious discrimination."

Mr. Justice Clark, at p 253, likewise cited *Williamson* v. *Lee Optical of Oklahoma, Inc., supra,* as well as *McGowan* v. *Maryland,* 366 US 420, 426 (81 S Ct 1101, 6 L ed 2d 393), in recognizing that all inequities of suffrage may not constitute invidious discrimination "if any state of facts reasonably may be conceived to justify it." At p 260 of his opinion, Mr. Justice Clark stated that "there is no requirement that any plan have mathematical exactness in its application. Only where, as here, the total picture reveals incommensurables of both magnitude and frequency can it be said that there is present an invidious discrimination." Later, on the next page, he pointed out that "the majority appears to hold, at least *sub silentio,* that an invidious discrimination is present, but it remands to the 3-judge court for it to make what is certain to be that formal determination."

The whole tenor of Mr. Justice Stewart's concurring opinion is based upon the applicability, to ultimate factual decision in the case of *Baker* v. *Carr,* of the traditional equality clause tests. See particularly his reference to *MacDougall* v. *Green, supra; McGowan* v. *Maryland, supra;* and *Metropolitan Casualty Insurance Co.* v. *Brownell,* 294 US 580, 584 (55 S Ct 538, 79 L ed 1070), all of which are found at pp 265, 266, of Mr. Justice Stewart's concurring opinion.

Mr. Justice Harlan's opinion, relying upon *McGowan* v. *Maryland, supra,* and *Williamson* v. *Lee Optical of Oklahoma, Inc., supra,* also recognized the applicability of the traditional equality clause test, but concluded "that the State action complained of could have rested on some rational basis", p 338.

What we have, then, from *Baker* v. *Carr* is confirmation that the "well developed and familiar" judicial standards under the equality clause are to be applied in cases such as this to determine the existence or nonexistence of invidious discrimination. Mr. Justice Kavanagh's opinion on original hearing, 360 Mich 1, beginning at p 26, refers to many Federal and State court cases applying such standards to a variety of invidious discrimination claims. It is not necessary to repeat his references here; we can, however, take the law from them. The lesson those cases teach us is that the Fourteenth Amendment requires substantial equality between citizens except where there exist differences justifying the classification of citizens, in which event there must be equality within the classes. Quoting from *Gulf, C. & S. F. R. Co.* v. *Ellis,* 165 US 150, 155 (17 S Ct 255, 41 L ed 666), the United States supreme court in *Hartford Steam Boiler Insurance Co.* v. *Harrison,* 301 US 459, 462 (57 S Ct 838, 81 L ed 1223), said:

"*Mere* difference is not enough: the attempted classification 'must always rest upon some difference which bears a reasonable and just relation to the act in respect to which the classification is proposed, and can never be made arbitrarily and without any such basis.' "

As Mr. Justice TALBOT SMITH pointed out in his opinion on original hearing of this case, 360 Mich 1, at p 52, the classification must be rooted in reason, the distinctions made between classes must have "some relevance to the purpose for which the classification is made", quoting from *Walters* v. *City of St. Louis,* 347 US 231, 237 (74 S Ct 505, 98 L ed 660). See, also, *McGowan* v. *Maryland, supra,* 425.

There can be no doubt that application of these abstract principles to cases involving the electoral process will frequently present grave difficulties in their solution. There will be required close scrutiny of the object of classification into electoral districts, of the differences among our citizens based upon which their classification into electoral districts is sought to be justified, and of the relation between such asserted differences and the object of the classification.

Perhaps the most difficult problems will arise in attempting to determine what is the object of the classification and whether it is a legitimate objective within a permissible policy of the State. See *Williamson* v. *Lee Optical of Oklahoma, Inc.,* 348 US 483 (75 S Ct 461, 99 L ed 563). Prudence requires that we remind ourselves that we are still speaking only of the requirements of the equality clause of the Fourteenth Amendment. We are not at this point (because the facts of our case do not require it) addressing ourselves to the constitutional guarantee to every State of a republican form of government. Article 4, § 4, United States Constitution. See *Baker* v. *Carr*: New Light on the Consti-

tutional Guarantee of Republican Government, Arthur Earl Bonfield, 50 Cal L Rev 245.

It seems hardly to be doubted that a State may have as a legitimate objective of classification, the effective representation of all its people in the legislative branch of government by legislators known, accessible, and responsive to their constituents' needs and that, so long as the districts in which the people are arranged have a reasonable and just relation to *that* purpose, the *minor* practical inequalities which *unavoidably* may result therefrom would not be violative of the rights guaranteed by the equality clause. No one has suggested, nor could anyone so suggest, that such was the purpose of the amendments. Even if we were to assume that was the purpose of the amendments, the wide disparity in the ratio of population between the most populous and the least populous districts (6.5 to 1 in 1952, over 12–1/2 to 1 today), a disparity neither minor nor unavoidable, would require our finding the amendments invidiously discriminatory in violation of the equality clause and, therefore, void.

As yet unresolved is the question whether a State may, as a matter of State policy, have as its objective in classifying its people into electoral districts, the dilution of the voting strength of some in favor of others. That, it would seem from the public controversy which followed announcement of the decision in *Baker* v. *Carr,* is the significant question. And that was precisely the objective of the 1952 amendments to our Constitution, an objective not difficult to perceive. See Mr. Justice KAVANAGH's, opinion at 360 Mich 1, 40, and Mr. Justice TALBOT SMITH's at 360 Mich 1, 57. Whether or not the objective was permissible, a decision which need not be reached here although it is assumed to be permissible in the current opinions for dismissal, the arrangement of the districts was made without any

discernible or conceivable basis, let alone upon any rational basis, and for that reason cannot withstand plaintiff's constitutional attack.

Beyond the objective of affording to citizens effective representation in the legislature, it is difficult for me to conceive of any other legitimate State purpose for classification of citizens in their participation in the electoral process, a process inherently the equal right of each individual citizen. Perhaps there are such other legitimate objectives of classification which would constitutionally justify State denial of the citizen's right to a free and undiluted ballot, but if there are such, none has been suggested nor can any be imagined by me which would save the 1952 amendments from constitutional invalidity.

I agree with Mr. Justice KAVANAGH's conclusion that today's declaration of invalidity of the 1952 amendments reinstates sections 2 and 4 of article 5 of the Constitution of 1908 as they existed prior to their attempted amendment. I also agree that the present senatorial districts cannot be sustained under the reinstated constitutional sections for the reason that their gross population disparities violate the reinstated requirement that they be arranged in accordance with population, as that requirement has been construed in *Giddings* v. *Secretary of State, supra,* and *Williams* v. *Secretary of State, supra.*

This brings me to the matter of relief. Mr. Justice KAVANAGH's proposed judgment contemplates that the presently constituted senate may continue to function during the balance of the terms of its members, notwithstanding our declaration of invalidity of the constitutional provisions which arranged the districts within which its members were elected, on the theory that until succeeded by legally elected senators the present incumbents shall be entitled to

serve as *de facto* officers. He also contemplates that the incumbent senators properly may participate in the enactment of laws by means of which the judgment of this Court may be effectuated,—in other words, that the senate districts be rearranged in accordance with the provisions of reinstated sections 2 and 4 of article 5 of the Constitution of 1908 and means provided for the nomination and election of senators therefrom for the ensuing legislative term.

The Chief Justice, relying upon *Norton* v. *Shelby County,* 118 US 425 (6 S Ct 1121, 30 L ed 178), and citing *Carleton* v. *People,* 10 Mich 250; *People* v. *Payment,* 109 Mich 553; and *Kidd* v. *McCanless,* 200 Tenn 273 (292 SW2d 40), asserts that by our ruling that the 1952 amendments are void, "the senatorial districts created thereby become nonexistent" and, consequently, he concludes that the incumbents cannot act as *de facto* officers in the absence of *de jure* offices. Presumably, it would follow from his conclusion, there being no *de jure* nor *de facto* State senators following our judgment today, either that the full legislative power of the State resides exclusively in the house of representatives which may alone legally enact the necessary laws to effectuate the Court's judgment, or that the whole legislative process is suspended for lack of a validly existing senate. The prospect of an unicameral legislature, even for only the time it may take to establish new senatorial seats pursuant to the Constitution, presents a heady temptation for judicial experimentation. The other prospect, which one of my Brothers earlier[7] characterized as an "argument *in terrorem*", is not a practical possibility so long as this Court exercises responsibly its authority. I know of no constitutionally responsible court in the land which

---

[7] Mr. Justice BLACK, *Scholle* v. *Secretary of State,* 360 Mich 1, 120.

ever has, or would, countenance such a chaotic re-
sult,—and, certainly, there is no compelling reason
for us to lead the way.

The *de facto* doctrine is another of our legal fic-
tions by which the law manages somehow to pre-
serve orderly governmental procedures when by
some legal defect invalidating one's title to public
office, his otherwise valid acts will be upheld by the
courts. Otherwise, all who have business to transact
with public officials would be compelled to ascertain
their status as *de jure* officials at pain of invalidity
of acts done under color of title to office. The doc-
trine has a salutary effect, thus broadly stated, but
its obvious beneficial effect has been limited by some
courts which have said that the doctrine does not
apply where there is no *de jure* office. *Norton* v.
*Shelby County, supra,* relied upon by the Chief
Justice, is such a case but, like others so limiting
the doctrine, it involved a situation where an office
was attempted to be created, by act subsequently
declared invalid, to perform duties constitutionally
delegated to another office. Limitation of the doc-
trine in such cases settles what is fundamentally a
dispute between 2 contenders for public power—one
a *de jure* and the other a *de facto* officer. In the
absence of such conflict, where the only question is
whether validity is to be given to the acts of a
*de facto* officer whose office is found to have been
illegally created, there appears to be no reason in
logic or law to so restrict or otherwise limit ap-
plication of the legally convenient *de facto* doctrine.

In *Norton,* the officers whose rights to office were
being challenged were asserting powers constitu-
tionally delegated to the justices of the peace of the
county. There were *de jure* officers performing such
duties whereas here there is no such conflict between
warring contestants for public office. The factual
distinction, in my view, is significant. In *Norton,*

failure to find the usurpers to be *de facto* officers did not result in a failure of performance of any governmental office, let alone the legislative branch of government, as is the case here.

In the case now before us, it is not correct to say that the 1952 amendments which we here declare invalid created the senate, or the office of State senator, nor does the Chief Justice so say. He refers to the amendments as having created the senatorial districts and in this he is right. This distinction also is important in considering whether the refusal to apply the *de facto* doctrine in the *Norton* case has any applicability to our facts. Section 1 of article 5 of the Constitution of 1908, concerning the validity of which no challenge has been made, vests the legislative power of the State in a senate and house of representatives, subject to a reservation of some of such power to the people themselves. *That* is the valid constitutional provision which creates the senate, membership in which the incumbent senators claim to possess and the powers of which have been asserted continuously since 1953 under color of what was a presumptively valid constitutional arrangement of districts. I think no more is required to invoke the *de facto* doctrine to uphold the prior actions of the State senate and to afford it sufficient continuing status, at least until December 31, 1962, to preserve orderly government in this State and to provide a means by which the legislative branch of government can be organized next year as is required by our Constitution.

Lest it be thought what is here said is a novel departure from the law, reference should be made to the opinions in *Carleton* v. *People,* 10 Mich 250, cited by the Chief Justice as has been noted above. There, county officers were recognized as officers *de facto* who had been elected to fill offices which had not yet been legally created, the act creating such offices

having been passed by the legislature without giving it immediate effect so as to become law before the election. In *Attorney General, ex rel. Dingeman,* v. *Lacy,* 180 Mich 329, the acts of a domestic relation's court judge of Wayne county were upheld by a unanimous court as the acts of a *de facto* officer after the legislative act creating the court was declared unconstitutional, the circuit court having been granted by the Constitution the jurisdiction attempted to be granted by the legislature to its newly created domestic relations court. Reference should also be made to the cases cited in 43 Am Jur, Public Officers, § 475, from which it appears that *Norton* v. *Shelby County, supra,* is not by any means universally followed by the various State courts. I see absolutely no reason in logic to follow it in this case, nor does our law, legislative or common, require that we do so.

The problem with which we deal is too complex for simple solution. I have tried in this opinion to suggest some of the factors which may be judicially considered in determining compliance in such matters with the guarantees of equal protection provided by our own article 2 as well as the Fourteenth Amendment. Because the judicial problem is new, we must draw upon analogous situations in which such guarantees of equality have been applied. This can be, by the nature and magnitude of the problem, no more than a first effort at understanding it and recognizing its outer boundaries.

For reasons stated above, I join in Mr. Justice Kavanagh's disposition of this case.

Otis M. Smith, J., concurred with Souris, J.

Black, J. (*concurring*). At present writing 5 opinions of this case, aggregating 76 typewritten

sheets, have been submitted for consideration of other members of the Court. Surely, borrowing now from Mr. Justice Clark (*Baker* v. *Carr*, 369 US 186, at p 251 [82 S Ct 691, 7 L ed 2d 663]), what we write bursts with too many words that go through so much and say so little. I would get back on the Federal track, the better to ascertain where we are, and where we should and so must go.

. *First:* Palatable or not, it must be acknowledged by all that the Supreme Court of Michigan does not have the final word for the case before us. We sit now, exclusively as an inferior court, by direction of the United States supreme court, "in order that such proceedings may be had in the said cause, in conformity with the judgment of this [United States supreme] court above stated, as accord with right and justice, and the Constitution and laws of the United States, the said appeal notwithstanding."[1] By such mandate we are told to determine the merits of a presented Federal question; not to decide whether we personally prefer—or do not prefer—the questioned amendments of our State's Constitution, and certainly not to determine whether the amount of the majority vote cast 10 years ago for such amendments is sufficient to overcome the Federal equality clause. No majority vote cast within a State, however overwhelming or even unanimous, can overcome such pre-eminent law. The reason:

"This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." United States Constitution, Art 6 (2).

---

[1] Mandate of supreme court of the United States.—REPORTER.

*Second:*   With triumvirate backs turned upon what proceeds apace—under *Baker* v. *Carr*—in many of the States, a tuneful triphony is sung for preservation of what my Brother Dethmers repeatedly refers to as "republican government."[2]   The song is not ended.   Judging by past dissertations, the political melody will linger on until all voices are stilled by that final judgment of this case which, sooner or later, will be entered upon Federal precepts.   "Intervention" by the Federal supreme court seems to irritate the more, *Baker* v. *Carr* and Justice Kavanagh's opinion having applied fresh salt, as our former Chief Justice beholds what to him are the progressively lamentable doings of high court justices he has dubbed "judicial activists."   (See U. S. News issue cited below, p 93.)   Compare his stirring appeal today, for protection of "republican government" from the meddlement of activistic judicial officers, with what was said by him 3 years ago last December, in New York City:

"That there has been a trend toward centralization in Washington can scarcely be gainsaid.   Challenged at mileposts along the way, it has advanced under the green light of judicial decisions.   *   *   *
"These are part of the body of decisions giving rise to a concern that, by judicial construction, national powers are being too greatly and dangerously en-

---

[2] Mr. Justice Frankfurter, dissenting in *Baker* v. *Carr*, declared (p 324) what regrettably seems to be, that "Apportionment battles are overwhelmingly party or intraparty contests."   By appended footnote the justice calls attention to "an instance of a court torn, in fact or fancy, over the political issues involved in reapportionment," citing *State, ex rel. Lashly*, v. *Becker*, 290 Mo 560 (235 SW 1017).

Intrigued, I have reviewed the case and discover among others this sobering confession (p 625):

"Shackled as we are with partisan bias and prejudice, it is humiliating to confess that even judges in our highest courts are unable to divorce law and politics.   In emergencies, great and small, they have heard the Macedonian cry, and have not been disobedient to the call."

Yes, that Macedonian cry has been audible, all over Michigan, ever since this suit was instituted in 1959.

larged and State and local power correspondingly contracted. Of this trend, the conference of chief justices and many others have spoken with consternation. Great judicial self-restraint in this critical field of Federal-State relationships was enjoined upon the supreme court by the members of the conference. I concur."[3]

What indeed has contributed—in Michigan at least —to this trend toward "centralization" which, at Pasadena, is said to have caused so much "consternation"? Is it not, in fulsome part, due to the steady failure of many-times-elected executive officers of this and other similarly situated States (some being presently consternated Brethren seated here) to press upon legislators—as our Governor Groesbeck did with such force and effect in 1925—their sworn oath to rearrange and reapportion every 10 years? As said in Justice KAVANAGH's opinion, the issue before us never could have traced its way to the Potomac had the legislature of Michigan, during the decades of the 1940's and 1950's, performed faithfully according to constitutional oath. Let us, then, have done with criticism of that to which all of us, in greater or lesser degree of course, have contributed as governors, attorneys general, judges and citizens. Instead, let us turn to duty directed by the supremacy clause, the National equality clause, and our own fully concordant pledge of the protection of equal laws. And let us not report back to our superior court that we have just discovered a technical way to evade determination of the merits; such as saying that the questioned amendments cannot be judged void without destroying the law *de jure* which is creative of the office of State senator.

---

[3] U. S. News and World Report: "What a State Chief Justice Says About the Supreme Court," December 12, 1958, pp 88, 91, 92, address before the Congress of American Industry by "John R. Dethmers, Chief Justice, Supreme Court of Michigan."

As Justice SOURIS points out, the simple fact answer to Chief Justice CARR's "let's do, nothing" motion is that original section 1 of article 5, the standing creator of the office of State senator, lives on as before unaffected by and unquestioned in this litigation. Furthermore, *Norton* v. *Shelby County,* 118 US 425 (6 S Ct 1121, 30 L ed 178); on which our Chief Justice presently relies, has since been confined most carefully in its proper area of fact by the United States supreme court. See *Shapleigh* v. *San Angelo,* 167 US 646, 658 (17 S Ct 957, 42 L ed 310), and *Tulare Irrigation District* v. *Shepard,* 185 US 1, 14 (22 S Ct 531, 46 L ed 773). *Shapleigh,* quoted in the margin,[4] is a fair example of such continued confinement, in the courts of the United States, of *Norton's* rule that where no law creates an office such an office cannot be occupied *de facto.*

*Third:* We are, I repeat, directed to consider and decide the merits of a Federal question the United States supreme court has sent back to us in the clothing of jurisdiction and justiciability. Is it not, then, exclusively due that we should look for judicial guidance to current Federal authority, and to such of our own cases as may accord therewith, rather than to the relevantly superseded scroll of the Federalists and other writings of the Colonial era? The Federalist Papers, ably conceived for times when all west of the Alleghanies was trackless and savage, were written more than 175 years ago by men who could not possibly have foreseen the Fourteenth

---

[4] *"Norton* v. *Shelby County,* 118 US 425, is not to the contrary. There certain persons who undertook to act as county commissioners were adjudged to be usurpers as against others who were lawful officers, and it was held that, as the acts of the legislature which created the board of commissioners was unconstitutional, there were no *de jure* offices, and, therefore, no *de jure* officers. But the general rule was recognized that 'where an office exists under the law, it matters not how the appointment of the incumbent is made, so far as the validity of his acts are concerned. It is enough that he is clothed with the insignia of the office, and exercises its powers and functions.' "

Amendment, the seeds from which the amendment grew, and its final mandate of equal protection. The equality clause of the Fourteenth Amendment is an order directed to each State. It has nothing to do with the political structure of the National government and, in the context of our current problem, is an understandable contradiction of that structure. The clause pointedly prohibits each State from denying "to any person within its jurisdiction the equal protection of the laws." It does, under direction of our superior, put upon us a new task, that of inquiring into the merits of plaintiff's claim of denial by Michigan of Fourteenth Amendment equality of voting rights; an inquiry 3 of us resolved affirmatively in *Scholle* v. *Secretary of State,* 360 Mich 1.

Nothing done within the borders of Michigan, whether by constitutional provision, statute, executive proclamation, ordinance, or administrative order, may impede the execution of that task. The supremacy clause so dictates. So do the authorities cited in Justice Kavanagh's opinion, to which I would add *Bute* v. *Illinois,* 333 US 640 (68 S Ct 763, 92 L ed 986);[5] also the adjuration which, in 1899 and again in 1901, was declared and repeated in the 2 *Blythe Cases* (*Blythe* v. *Hinckley,* 173 US 501, 508 [19 S Ct 497, 43 L ed 783]; 180 US 333, 338 [21 S Ct 390, 45 L ed 557]).[6] Hence my disagreement with Justice Dethmers' repetitious and apparently serious postulate that "An equal protection of the laws problem is not presented." That postulate I now

---

[5] "We recognize that the Fourteenth Amendment, as part of the supreme law of the land under article 6 of the original Constitution, supersedes 'any Thing in the Constitution or Laws of any State to the Contrary notwithstanding'." (*Bute* v. *Illinois,* p 658.)

[6] "The State courts had concurrent jurisdiction with the circuit courts of the United States, to pass on the Federal questions thus intimated, for the Constitution, laws and treaties of the United States are as much a part of the laws of every State as its own local laws and constitution, and if the State courts erred in judgment it was mere error, and not to be corrected through the medium of bills such as those under consideration." (180 US 338.)

examine, admittedly with distrust as well as curiosity.

Justice DETHMERS simply cannot be right; at least in this case where our words are not final words. If an "equal protection of the laws problem is not presented," the supreme court of the United States would not have taken jurisdiction of this case and would not have sent it back for meritorious consideration in the light of another equal protection case, *Baker* v. *Carr.* When in the face of such mandate any State court judge says that the question we are directed to decide "is not presented," he surely defies higher authority. He should be challenged, with due vigor by others seated here, lest silence suggest tacit approval.

*Fourth:* As an understating Englishman would say, our problem is not without difficulty. No matter where we look and turn, the ominous storm of predicament gathers with warning of reprisals and conjured new reasons why this.Court cannot move with affirmative firmness. To Dirksenize our judgment by telling the legislature that questioned sections 2 and 4 will be judged void, as soon as that body enacts validly under original sections 2 and 4, is to perpetuate an unconstitutional body for another 2 years (and doubtless more years depending on the outcome of 4 Supreme Court elections scheduled during the next 9 months). To delay judgment, and thus to knuckle before today's threat to obstruct Federal as well as State justice, is unthinkable. That threat, once there is an overt act, will menace the threateners only.[7] And to dismiss the case with

---

[7] "Whoever, by threats or force, wilfully prevents, obstructs, impedes, or interferes with, or wilfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order, judgment, or decree of a court of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both." Pub L 86–449, Title 1, § 101, May 6, 1960, 74 Stat 86 (18 USCA, 1961 Supp, § 1509).

prejudice means sure reversal; reversal for having ruled that a State constitutional provision is somehow of greater force than the Federal equality clause.

And the disunited Kellys provide no help; only more trouble. Attorney General Kelley would have us act, promptly in time for election day November 6th. Justice Kelly warns us act not at all, and even that with slow "haste." So a trouble is what man makes it, and when Kellys stir up its brew, the quaffing is man's own torment, and woe is his requiem too.

" 'Here's to the Maine, and I'm sorry for Spain,'
Said Kelly and Burke and Shea.     *     *     *

" 'Wherever there's Kellys there's trouble,' said
     Burke.
" 'Wherever fighting's the game,
Or a spice of danger in grown man's work,'
Said Kelly, 'you'll find my name.' "[8]

If what our majority does means "haste" to my veteran Brothers, so be it. They are the ones who cried "haste" when I formally moved—shortly after the opinions of *Scholle* v. *Secretary of State* were released April 23, 1962—that a date be set for resubmission during our June session, preferably June 11th (an available date which stayed available). That was not done, as the order quoted in Justice KAVANAGH's opinion fully discloses, and there we find the real reason why this Court is in position where it may allot 33 days only for the enactment of that constitutional legislation original and now reinstated sections 2 and 4 do require.

Sometimes appellate judges must get down to work on one all-important case to outright exclusion of less important work. This is such a case.

---

[8] Joseph, Ignatius Constantine ,Clarke, The Fighting Race.—RE-PORTER.

Whatever advices our effort will provide for the constitutional convention must be sent forth with dispatch. That assembled body is due for final adjournment 14 days hence, and its regular successor cannot be around until 1977. And we cannot legalize, even *de facto,* an unconstitutional body for any longer period of time than is fairly necessary to legislate and then elect.

Little more need be said about "haste." A liberal dose of activistic catharsis will do Michigan's judicial process no harm and, in this instance, may provide for our State a healthy new start. Some regard must be had in the course of judicial functioning for the comparative shortness of human life. And if as it seems Justices seated here must belong to one class or the other, I prefer "judicial activism" over "judicial obstructivism."

*To conclude:* The merits of this case presented no more difficulty 2 years ago than now. Jurisdiction to judge the merits did. Now that we have been loaned the Fourteenth Amendment "for employment in cases where the constitution or laws of a State create and insure gross inequality of voting power of citizens" (*Scholle* v. *Secretary of State,* 360 Mich at 120), I again, this time with justiciable authority, "agree fully with Mr. Justice KAVANAGH's presentation of the case and especially with his conclusions upon the admitted as well as proven facts." (*Scholle* v. *Secretary of State, supra,* at 123.)

ADAMS, J., did not sit.